26-1479

IN THE

# United States Court of Appeals for the Federal Circuit

ATLAS POWER LLC,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee.

Appeal from the United States Court of International Trade in
1:23-cv-00084- Lisa W. Wang, Judge

## OPENING BRIEF OF
## PLAINTIFF-APPELLANT ATLAS POWER LLC

J. Kevin Horgan
Merisa A. Horgan
**deKieffer & Horgan, PLLC**
1015 Fifteenth St., N.W.
Washington, DC 20005

(202) 783-6900

*Counsel for Plaintiff-Appellant*

May 04, 2026

FORM 9. Certificate of Interest

Form 9 (p. 1)<br>March 2023

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

### CERTIFICATE OF INTEREST

**Case Number** 2026-1479

**Short Case Caption** Atlas Power LLC v. US

**Filing Party/Entity** Atlas Power LLC

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 05/04/2026

Signature: /s/ J. Kevin Horgan

Name: J. Kevin Horgan

**FORM 9. Certificate of Interest**

| 1. **Represented Entities.** Fed. Cir. R. 47.4(a)(1). | 2. **Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | 3. **Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☑ None/Not Applicable |
| Atlas Power LLC | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐     Additional pages attached

**4. Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

☑    None/Not Applicable                ☐    Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

**5. Related Cases.**  Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐  Yes (file separate notice; see below)    ☑  No    ☐  N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b).  **Please do not duplicate information.**  This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal.  Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

☑    None/Not Applicable                ☐    Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |

**TABLE OF CONTENTS**

STATEMENT OF RELATED CASES ...................................................................1

JURISDICTIONAL STATEMENT .....................................................................1

STATEMENT OF THE ISSUES..........................................................................1

STATEMENT OF THE CASE...............................................................................2

STATEMENT OF FACTS .....................................................................................4

SUMMARY OF THE ARGUMENT ....................................................................8

      1.    The Subject Merchandise Consists of Excluded GPUs .......................8

      2.    The Subject Merchandise Consists of Unfinished Logic Boards .......11

ARGUMENT ......................................................................................................12

I.     Standard of Review...................................................................................12

II.    The Subject Merchandise is Excluded from 301 Tariff Assessments...........13

      A.    The Subject Merchandise Consists of Excluded GPUs ......................13

      B.    The Subject Merchandise Consists of Printed Circuit Board Assemblies Constituting Unfinished Logic Boards ............................20

CONCLUSION     .......................................................................................29

## TABLE OF AUTHORITIES

**Cases**

Atlas Power LLC v. United States,
  Slip Op. 2026-4, No. 23-00084 (CIT) ............................................................ *passim*

Baxter Healthcare Corp. of P.R. v. United States,
  182 F.3d 1333 (Fed. Cir. 1999)..................................................................13

Blue Sky the Color of Imagination, LLC v. United States,
  160 F.4th 1334 (Fed. Cir. 2025) ................................................................12

Carl Zeiss, Inc. v. United States,
  195 F.3d 1375 (Fed. Cir. 1999)............................................................13, 17

Clarendon Marketing, Inc. v. United States,
  144 F.3d 1464  (Fed. Cir. 1998).................................................................17

Deckers Outdoor Corp. v United States,
  714 F.3d 1363 (Fed. Cir. 2013)..................................................................23

Ford Motor Co. v. United States,
  157 F.3d 849 (Fed. Cir. 1998)....................................................................12

Goodman Manufacturing, L.P. v. United States,
  69 F.3d 505 (Fed. Cir. 1995)......................................................................13

Hanser v. McDonough,
  56 F.4th 967 (Fed. Cir. 2022) ....................................................................18

Hayes-Sammons Co. v. United States,
  55 C.C.P.A. 69 (1968) ..........................................................................17, 19

Len-Ron Manufacturing Co. v. United States,
  334 F.3d 1304 (Fed. Cir. 2003)..................................................................12

ME Glob., Inc. v. United States,
  633 F. Supp. 3d 1349 (CIT 2023)...............................................................23

Midwest-CBK, LLC v. United States,
 163 F.4th 1365 (Fed. Cir. 2026) ............................................................12

Novacor Chems., Inc. v. United States,
 171 F.3d 1376 (Fed. Cir. 1999)...............................................................18

Optrex Am., Inc. v. United States,
 475 F.3d 1367 (Fed. Cir. 2007).................................................................27

Shamrock Bldg. Materials, Inc. v. United States,
 2024 U.S. App. LEXIS 26748 ..................................................................13

**Statutes**

28 U.S.C. § 1295(a)(5).................................................................................1

28 U.S.C. § 1581(a) ....................................................................................1

28 U.S.C. § 2639(a)(1)...............................................................................13

Harmonized Tariff Schedule of the United States, Gen. R. Interp. 2(a) (USITC 2021) ...................................................................................................*passim*

Harmonized Tariff Schedule of the United States, Subheading 8473.30.1180 (USITC 2021). ..........................................................................................*passim*

Harmonized Tariff Schedule of the United States, Chapter 99 Notes 20(ttt)(iii)(108) through (110)(USITC 2021) ................................................. *passim*

**Administrative Determinations**

Notice of Reinstatement of Certain Exclusions: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation, 87 Fed. Reg. 17380 (March 28, 2022)............................................................3, 16

**Other Authorities**

HQ 952862 (Nov. 1, 1994) ..........................................................................27

HQ 957287 (August 9, 1995).......................................................................27

HQ 956839 (Mar. 28, 1996) ...............................................................................27

HQ 962847(October 15, 1999) ...........................................................................26

HQ 964880 (Dec. 21, 2001)................................................................................27

IEEE 100 The Authoritative Dictionary of IEEE Standards Terms (Seventh Edition)..........................................................................................................21, 28

Rigdon, Dictionary of Computer and Internet Terms (2016) ...............................20

What is a GPU?, Intel (https://www.intel.com/content/www/us/en/products/docs/processors/what-is-a-gpu.html) .......................................................................................................15

## STATEMENT OF RELATED CASES

In response to Federal Circuit Rule 47.5(a), Plaintiff-Appellant states that there is no other appeal in or from the same civil action or proceeding in the originating tribunal that was previously before this or any other appellate court.

## JURISDICTIONAL STATEMENT

This Court has jurisdiction to hear this appeal pursuant to 28 U.S.C. § 1295(a)(5), as an appeal from a final decision of the U.S. Court of International Trade ("CIT"). The CIT had jurisdiction under 28 U.S.C. § 1581(a), which gives the CIT jurisdiction over any action commenced with respect to the denial of a protest by United States Customs & Border Protection under section 515 of the Tariff Act of 1930.

This appeal is timely. Plaintiff-Appellant Atlas Power LLC filed its notice of appeal on February 26, 2026, within 60 days of the CIT's final decision issued on January 27, 2026, and its final judgment issued on February 24, 2026, in Atlas Power LLC v. United States, No. 23-00084.

## STATEMENT OF THE ISSUES

This case presents the following issues:

1.      Whether NVIDIA CMP GPUs imported by Atlas are excluded from assessments of Section 301 tariffs as "Printed circuit assemblies for rendering images onto computer screens ("graphics processing modules"); and

1

2.    Whether NVIDIA CMP GPUs imported by Atlas are excluded from assessments of Section 301 tariffs as "Printed circuit assemblies, constituting unfinished logic boards."

**STATEMENT OF THE CASE**

This appeal arises out of an action contesting the denial of Plaintiff's protest regarding the assessment of Section 301 Tariffs on four shipments of Chinese-origin NVIDIA CMP 170 HX graphics processing units ("GPUs") ("the subject merchandise").  Plaintiff, Atlas Power LLC (Atlas), entered the merchandise from a foreign trade zone ("FTZ") into the commerce of the United States during the period October 5, 2021, through November 1, 2021. When Atlas entered the subject merchandise into the commerce of the United States, Atlas classified the merchandise under subheading 8473.30.1180 of the Harmonized Tariff Schedule of the United States ("HTSUS"), which covers, among other things, parts and accessories of automated data processing ("ADP") machines.  At the time of entry, Chinese-origin merchandise classified under HTSUS subheading 8473.30.1180 was generally subject to Section 301 tariffs of 25% ad valorem. Plaintiff's Statement of Undisputed Material Facts 6 (Appx000096) (*hereinafter* "PSUMF").

In March 2022, prior to the liquidation of the Atlas entries, the Office of the United States Trade Representative ("USTR") retroactively reinstated certain exclusions from Section 301 Tariffs.  The list of excluded products was set forth in

HTSUS subsection 9903.88.56.  Among the listed products were:

(108) Printed circuit assemblies for rendering images onto computer screens ("graphics processing modules") (described in statistical reporting number 8473.30.1180);

(109) Printed circuit assemblies to enhance the graphics performance of automatic data processing (ADP) machines ("accelerator modules") (described in statistical reporting number 8473.30.1180); and

(110) Printed circuit assemblies, constituting unfinished logic boards (described in statistical reporting number 8473.30.1180).

See *Notice of Reinstatement of Certain Exclusions: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 87 Fed. Reg. 17380 (March 28, 2022). PSUMF 6 (Appx000096).

In post-summary corrections filed by Atlas, Atlas claimed that the subject merchandise was excluded from assessments of Section 301 Tariffs by virtue of the retroactive reinstatement of the above-referenced exclusions.  United States Customs & Border Protection ("CBP") rejected the corrected entries. (Ex. 2 at Appx000001-Appx000004).  Upon liquidation of the entries, Section 301 Tariffs were assessed on the subject merchandise.  Atlas then filed a protest asserting that the imported NVIDIA CMP 170HX GPUs were excluded from the assessment of 301 Tariffs.  On November 22, 2022, the protest was denied.  In its decision on the

protest, CBP did not alter the classification of the subject merchandise under HTSUS 8473.30.1180. CBP did, however, reaffirm its decision that the subject merchandise was not excluded from assessments of 301 Tariffs. PSUMF 10 (Appx000097).

On April 19, 2023, Atlas timely commenced an action in the CIT contesting the denial of its protest concerning the assessment of Section 301 Tariffs on the subject merchandise.

On January 27, 2026, in response to cross-motions for summary judgment, the CIT issued a decision holding that the imported merchandise was properly classified under HTSUS subheading 8473.30.1180 as parts of or accessories to automatic data processing machines ("ADPs"). The CIT also held that the imported merchandise did not qualify for any of the Section 301 Tariff exclusions listed in HTSUS Chapter 99, Notes 20(ttt)(iii)(108) through (110).  The CIT issued its final judgment order on February 24, 2026.

## STATEMENT OF FACTS

Atlas Power is a United States company that owns and operates data centers located in Butte, Montana, and Williston, North Dakota. PSUMF 1 (Appx000094). Atlas uses its data centers to mine cryptocurrency for its own account. PSUMF 2 (Appx000094-95).  Atlas also provides colocation services allowing unaffiliated

clients to rent rack space in Atlas data centers and install their own computer servers to use as they choose, with Atlas charging a fee for power, internet connectivity, maintenance services, *etc*. PSUMF 2 (Appx000094-95).

In 2021, Atlas prepared an investment brochure describing its plans to use its data center servers, including those containing the subject merchandise, to engage in cryptocurrency mining as well as other data processing tasks such as high-performance computing applications (artificial intelligence, graphics rendering, cloud computing, Internet of Things ("IOT")). PSUMF 3 (Appx000095).

The subject merchandise consists of printed circuit board assemblies ("PCBAs"). Slip Op. at 5-6; PSUMF 13 (Appx000009-10; Appx000097).  The subject merchandise incorporates a NVIDIA GA100-105F-A1 graphics processor. Slip Op. at 5-6; PSUMF ¶34 (Appx000009-10; Appx000100).  The subject merchandise does not incorporate a central processing unit ("CPU"). PSUMF 36 (Appx000100).  The subject merchandise does not have video outputs.  PSUMF 17 (Appx000098).  However, the server attached to the subject merchandise is able to use the server's built-in graphics display capabilities to display images on a computer screen. PSUMF 19 (Appx000098).

The undisputed evidence shows that the subject merchandise must be used with an automatic data processing ("ADP") machine.  Slip Op. at 7 (Appx000011). NVIDIA, Atlas, and both expert witnesses concurred that the subject merchandise

must be connected to a motherboard containing a central processing unit in order to function. Slip Op. at 17 & PSUMF 37 (Appx000021 & Appx000101).

The subject merchandise consists of logic boards. PSUMF 15, 24 (Appx000097, Appx000098-99). GPUs and computer accelerators are kinds of logic boards. PSUMF 23, 51 (Appx000098, Appx000103).

The subject merchandise was imported into the United States without the software drivers needed for the subject merchandise to operate. PSUMF 54, 56 (Appx000103, Appx000104). After importation of the subject merchandise, Atlas downloaded the drivers needed to use the subject merchandise from a private partner portal on an NVIDIA website and installed the drivers on the Atlas servers. PSUMF 56 (Appx000104). *See also* Slip Op. at 8 (Appx000012).

At the time the subject merchandise was imported into the United States it did not contain functioning Video Basic Input/Output System ("VBIOS") software. PSUMF ¶55 (Appx000103). After importation of the subject merchandise, NVIDIA provided Atlas with a functioning VBIOS for the subject merchandise via electronic download from a private partner portal. Atlas installed that VBIOS onto each individual GPU by downloading the VBIOS to a USB stick, plugging the USB stick into each GPU, and then running a command to flash the VBIOS onto each GPU. PSUMF ¶¶56-57 (Appx000104). *See also* Slip Op. at 8 (Appx000012).

The term GPU is used in the electronics industry to refer to logic boards

used to produce images. It is also used to refer to logic boards that use the parallel processing feature of a graphics processor to carry out large numbers of arithmetic calculations for computational purposes other than producing images. PSUMF 29 (Appx000099).

The record is replete with evidence that at the time of importation of the subject merchandise the term "GPU" is used to refer to all graphic processor-based logic boards that used parallel processing to carry out a variety of non-video tasks, including radar signal processing, reinforcement learning (a type of artificial intelligence algorithm), EDA software acceleration, wireless communication, gene sequencing, sensor tracking, hash functions, cryptography and cryptocurrency mining. See PSUMF ¶ 30-31 (Appx000099 -100) (Ex. 10, NVIDIA Dep. at 2-10 (Appx000726); Ex. 4, Khatri Expert Rpt at 62 (Appx000236); Ex. 25, Def. Admission 28 (Appx001285); Ex. 4, Khatri Expert Rpt at 31 (Appx000230); Ex 10, NVIDIA Dep at 12-18 (Appx000719); Ex. 7, Beckman Expert Rebuttal Rpt (Appx000348); Ex. 12, Beckman Dep at 22-19 (Appx000926-927); Ex. 15, NVIDIA Product Description Sheet (Appx001128)).

The essential character of a GPU is derived from its ability to carry out a large number of arithmetical calculations in parallel. PSUMF 26 (Appx000099). The large number of CUDA cores present in the GA 100 graphics processor contained in the subject merchandise makes the subject merchandise capable of

7

carrying out a large number of arithmetical calculations in parallel. PSUMF 27 (Appx000099). Customers for printed circuit board assemblies incorporating the GA 100 graphics processor use the printed circuit board assemblies for artificial intelligence deep learning and for many other tasks that benefit from the printed circuit board assemblies ability to carry out massive numbers of computations simultaneously. PSUMF 35 (Appx000100). Thus, the subject merchandise has the essential character of a GPU, even though it lacks a video output. The subject merchandise can still be used to carry out a large number of arithmetical calculations in parallel for many purposes other than displaying videos.

<b>SUMMARY OF THE ARGUMENT</b>

**1. <u>The Subject Merchandise Consists of Excluded GPUs</u>**

NVIDIA CMP GPUs are graphics processing modules as that term is commonly and commercially understood. This fact is based on the undisputed testimony of the producer NVIDIA, the importer Atlas, and the expert witnesses proffered by both the Plaintiff Atlas and the Defendant United States. GPU modules are explicitly excluded from assessments of Section 301 tariffs by virtue of HTSUS Chapter 99, Note 20(ttt)(iii)(108) (hereinafter "the GPU Exclusion"), which excludes "Printed circuit assemblies for rendering images onto computer screens ("graphics processing modules"). The CIT erred by interpreting the GPU

8

exclusion in a manner that is contrary to the plain language of the provision and the undisputed evidence in the record.

The plain language of the exclusion applies to all "Printed circuit assemblies for rendering images onto computer screens." The CIT's decision erroneously limits this language to PCBAs that produce video images.  The plain language of the exclusion indicates that it applies to all printed circuit assemblies that, like the subject merchandise, could be used in rendering images other than video by transferring image files from a GPU to a server containing a central processing unit ("CPU").  The server could use the central processing unit's built-in graphics capability to render those image files onto a computer screen.

The CIT's interpretation of the GPU exclusion is also overbroad because it would extend the exclusion to all printed circuit board assemblies that can render images. The undisputed evidence shows that printed circuit assemblies other than GPUs that may be used to render images, such as central processing units ("CPUs").  The CIT erred by adopting an interpretation of the GPU exclusion that makes it broad enough to include all printed circuit board assemblies that are capable of rendering images, *e.g.*, central processing units, not just GPUs.

The CIT's interpretation of the GPU Exclusion was not necessary to give meaning to all the words in the provision.  The evidence shows that the reference to printed circuit board assemblies for rendering images with a parenthetical

identification of GPU modules as the covered article refers to all printed circuit board assemblies containing graphics processors. The undisputed evidence shows that the terms GPU and GPU module are used interchangeably. The undisputed evidence shows that the essential character of a GPU is derived from the inclusion of a graphics processor that is capable of carrying out vast numbers of mathematical calculations simultaneously. The undisputed record shows that the ability of a GPU to carry out vast numbers of simultaneous calculations is used for a wide array of tasks other than displaying videos. Tasks that include analyzing DNA, tracking satellites, radar signal processing, reinforcement learning (a type of artificial intelligence algorithm), EDA software acceleration, wireless communication, gene sequencing, sensor tracking, hash functions, cryptography and cryptocurrency mining. See PSUMF ¶ 30-31 (Appx000099 -100) (Ex. 10, NVIDIA Dep. at 2-10 (Appx000726); Ex. 4, Khatri Expert Rpt at 62 (Appx000236); Ex. 25, Def. Admission 28 (Appx001285); Ex. 4, Khatri Expert Rpt at 31 (Appx000230); Ex 10, NVIDIA Dep at 12-18 (Appx000719); Ex. 7, Beckman Expert Rebuttal Rpt (Appx000348); Ex. 12, Beckman Dep at 22-19 (Appx000926-927); Ex. 15, NVIDIA Product Description Sheet (Appx001128)). Thus, the absence of a video output does not place the subject merchandise outside the commonly understood meaning of the term GPU module.

10

The application of GRI 2(a), HTSUS, required the CIT to treat even incomplete GPUs as complete GPUs.   Under the rule, unfinished goods are classified as finished goods if the unfinished good has the essential character of the finished goods.  If the CIT believed that the CMP GPU was not a complete GPU because it lacked a video display output, then the proper application of GRI(2)(a) leads to the conclusion that the subject merchandise should nevertheless be treated as a complete GPU for tariff purposes because the essential character of a GPU is derived from its graphics processor, not a video display output.

The CIT also erred by basing its decision on the actual use of the merchandise when the United States Trade Representative ("USTR"), the agency that drafted the exclusionary language, explicitly advised that 301 exclusions should not be applied based on the actual use of the merchandise.

## 2.  The Subject Merchandise Consists of Unfinished Logic Boards

If the CIT believed that the CMP GPU was not a complete GPU because it lacked a video display output, then it should have also concluded that the CMP GPU was an "unfinished" logic board.

The undisputed record shows that GPUs are logic boards because they are designed to perform massive numbers of logical calculations simultaneously.  A GPU without a video display output is therefore an unfinished GPU, *i.e.*, an unfinished logic board.

11

The CIT's application of GRI 2(a) to interpret the Logic Board Exclusion (110) by treating incomplete articles as complete articles is erroneous because this interpretation renders the exclusion a nullity.  Under the rule, unfinished goods are classified as finished goods if an unfinished good has the essential character of the finished goods.  In essence, the CIT's interpretation of GRI 2(a) would mean that no unfinished logic board would ever be excluded from 301 Tariffs because all unfinished logic boards would be classified as finished logic boards, and therefore ineligible for Logic Board Exclusion (110).

The CIT ignored the undisputed fact that the CMP GPUs were inoperable at the time of importation and, therefore, unfinished. In addition, the CIT ignored several CBP rulings that found that imported articles requiring the manipulation or installation of software after importation were unfinished at the time of importation.

**ARGUMENT**

## I.     Standard of Review

The Court of Appeals for the Federal Circuit reviews a decision of the Court of International Trade granting summary judgment "without deference." <u>Blue Sky the Color of Imagination, LLC v. United States</u>, 160 F.4th 1334, 1338 (Fed. Cir. 2025). See also <u>Ford Motor Co. v. United States</u>, 157 F.3d 849, 854 (Fed. Cir.

1998).  The Federal Circuit reviews the CIT's interpretation of a statute *de novo*.

Midwest-CBK, LLC v. United States, 163 F.4th 1365, 1369 (Fed. Cir. 2026).

When no material facts are in dispute, the inquiry "collapses into a determination of the proper meaning and scope of the HTSUS terms," a determination that is "a matter of statutory construction [that] is a question of law" that the Court of Appeals reviews *de novo*. Blue Sky the Color of Imagination, LLC v. United States, *supra, citing* Len-Ron Manufacturing Co. v. United States, 334 F.3d 1304, 1308 (Fed. Cir. 2003).

While 28 U.S.C. § 2639(a)(1), provides that a classification decision by CBP is presumed to be correct, the statutory presumption of correctness applies only to factual issues. See Shamrock Bldg. Materials, Inc. v. United States, 2024 U.S. App. LEXIS 26748 (Fed. Cir. October 23, 2024, *citing*, Goodman Manufacturing, L.P. v. United States, 69 F.3d 505, 508 (Fed. Cir. 1995) (presumption "not relevant" where there is no factual dispute).

Determining the meaning of a tariff term is a question of law. Baxter Healthcare Corp. of P.R. v. United States, 182 F.3d 1333, 1337 (Fed. Cir. 1999). "Absent contrary legislative intent, HTSUS terms are to be construed according to their common and commercial meanings, which are presumed to be the same. A court may rely upon its own understanding of the terms used and may consult

lexicographic and scientific authorities, dictionaries, and other reliable information sources." <u>Carl Zeiss, Inc. v. United States</u>, 195 F.3d 1375, 1379 (Fed. Cir. 1999) (citation omitted).

## II. The Subject Merchandise is Excluded from 301 Tariff Assessments

### a.    The Subject Merchandise Consists of Excluded GPUs

The exclusionary language for GPUs covers: "Printed circuit assemblies for rendering images onto computer screens ("graphics processing modules")."  This language, interpreted in light of the general notes and rules of interpretation of the HTSUS, makes it clear that all GPUs are exempt from 301 Tariffs.

The CIT's analysis of this issue was flawed from the start by the Court's adoption of an unsupported and unreasonably cramped definition of the term "GPU." In footnote four of Slip Op. 26-4, the CIT states that a "GPU is a specialized chip incorporated into a PCA… ."  The exhibit cited in support of this definition contains no definition of the term "GPU."  See Pl.'s Ex. In Supp. of Mot. for Summ. J., Ex. 15, (Appx001128) ("NVIDIA CMP 170HX Product Description Sheet").  In fact, the cited exhibit explicitly refers to the entire CMP 170HX assembly as a "dedicated GPU." *Id.*  Similarly, the cited internet resource, *What is*

14

*a GPU?, Intel,*[1] recognizes that the term GPU is used to refer to a discrete GPU chip that is mounted on its own circuit board, stating: "for more resource-intensive applications with extensive performance demands, a discrete GPU (sometimes called a dedicated graphics card) is better suited to the job."

The CIT's definition of GPU also conflicts with the uncontradicted, sworn testimony of the inventor of the GPU, NVIDIA, as well as the sworn testimony of the experts who testified for plaintiff and defendant, all agreeing that the subject merchandise consists of graphics processing units, *i.e.,* GPUs, as that term is commonly understood. See PSUMF ¶16 (Appx000098), *citing*, (Ex. 25, Def. Admission 28 (Appx001285); Ex. 4, Khatri Expert Rpt at 31 (Appx000230); Ex 10, NVIDIA Dep at 12-18 (Appx000719); Ex. 7, Beckman Expert Rebuttal Rpt (Appx000348); Ex. 12, Beckman Dep at 22-19 (Appx000926-927); Ex. 15, NVIDIA Product Description Sheet (Appx001128)).

In his sworn expert testimony, Dr. Khatri explained how the terms "graphics processing unit," "GPU," and "graphics processing module" are commonly and commercially understood.  They are interchangeable terms.  Dr. Khatri explained in response to the Government's questions as follows:

---

[1] https://www.intel.com/content/www/us/en/products/docs/processors/what-is-a-gpu.html

15

Q.  And you also used the term "graphics processing module." Can you explain what that term is as you're using it?

A.  Yeah, so I mean I'm using it synonymously as a graphics processing unit, because a graphics processing unit is some unit, is some circuit unit, that performs graphic processing, right. And, conversely, what -- they call it a graphics processing module; because, again, a module is some circuit entity that's performing a certain function; in this case, graphics processing. So I might use "graphics processing unit" or "graphics processing module" in an interchangeable fashion.

Q.  And why would you use it in an interchangeable fashion?

A.  Just because -- you know, like the word "GPU" is something that people would understand, and I might use the word "graphics processing module" as well. And, you know, it's just an equivalent use of the word.

In my day-to-day use I might use the word "graphics processing unit" more because it might be understood by people; but someone of ordinary skill in the art would understand when I say "graphics processing unit," I could have easily used the word "graphic processing module" and meant the same thing, right. "GPU" or "graphics processing unit" is more commonly used.  But at the end of the day, it's a graphics processing module, and there's no --there's no controversy or doubt about that. And anybody who read either of the two terms, "GPU" or "graphics processing module," would understand that I meant the same thing.

Q.  Is there a difference between the term "module" and "unit"?

A.  As an electrical engineer -- now, this is something I haven't done a -- you know, I haven't looked up in the authoritative -- you know, the IEEE authoritative dictionary.  So I couldn't tell you what the dictionary -- the IEEE dictionary definition is sitting here.  I can do this after we -- you know, at some point.  Maybe in preparation  for trial or something. But -- but the -- when I talk about a unit in class -- and if I was talking to my students and I say, "This circuit has a unit that does something" or I use the word "This circuit has a module that does some function," they would understand that it's -- I meant the same thing. In electrical engineering speak, when an electrical engineer talks to another electrical engineer, they would readily think that "unit" and "module" are interchangeable words.

Appx000785-786.

In light of the extensive expert testimony showing how the term "GPU" is

16

commonly and commercially understood, Defendant's admission that the subject printed circuit board assemblies are GPUs, and the CIT's acknowledgement that the parties used the term GPU to refer to printed circuit board assemblies incorporating a graphics processor, it was error for the CIT to adopt a different, unsupported, unreasonable and misleading definition of GPU in its decision.

The terms "graphics processing unit" and "graphics processing module" are used interchangeably in common and commercial parlance.  GPU Exclusion (108) explicitly covers graphics processing modules.

In its "Determination To Reinstate Certain Exclusions," USTR explicitly advised that: "The reinstated exclusions are available for any product that meets the description in the product exclusion. In particular, the scope of each exclusion is governed by the scope of the ten-digit Harmonized Tariff Schedule of the United States (HTSUS) subheadings and product descriptions in the Annex to this notice." Thus, USTR clearly intended GPU Exclusion (108) to cover all GPU modules, regardless of the actual use of any particular GPU module. The CIT should have determined that the subject merchandise was excluded because the undisputed evidence shows that the subject merchandise was commonly and commercially understood to be a GPU module. Every witness said so under oath. The CIT was wrong to hold otherwise.

Since the provisions of Chapter 99 of the HTSUS are to be interpreted

17

according to the general notes and rules of interpretation applicable to other chapters of the HTSUS, and GPU Exclusion (108) contains an explicit reference to GPUs, this provision should be interpreted as an *eo nomine* tariff provision because it describes the merchandise by name.  See Carl Zeiss, Inc. v. United States, 195 F.3d 1375, 1379 (Fed Cir. 1999), *citing*, Clarendon Marketing, Inc. v. United States, 144 F.3d 1464, 1467 (Fed. Cir. 1998).   "An *eo nomine* designation, with no terms of limitation, will ordinarily include all forms of the named article." *Id*., *quoting*, Hayes-Sammons Co. v. United States, 55 C.C.P.A. 69, 75 (1968).

In marketing material, NVIDIA refers to the CMP 170HX as a GPU, *i.e.*, "the NVIDIA CMP GPU."  PSUMF 16 (Appx000098). Plaintiff's and Defendant's witnesses deposed in this matter agree that the subject merchandise is a kind of GPU.  *Id*.  The subject merchandise embodies the essential character of a GPU, which is derived from its ability to carry out a large number of arithmetical calculations in parallel. PSUMF 26 (Appx000099).  The subject merchandise contains many CUDA cores which are arithmetic logic units ("ALUs"), making the subject merchandise capable of carrying out a large number of arithmetical calculations in parallel. PSUMF 27 (Appx000099).

Based on the foregoing evidence, there is no material dispute as to the fact that the subject merchandise consists of GPUs.  It is likewise indisputable that GPUs are within the scope of the exclusion by virtue of the explicit and unlimited

18

parenthetical reference to graphics processing modules in the exclusionary language.

In Hanser v. McDonough, 56 F.4th 967 (Fed. Cir. 2022), the Court of Appeals for the Federal Circuit described the correct approach to interpreting statutory language that includes parenthetical language. The Court said:

> There is no general rule or presumption that a parenthetical is always definitional. Instead, as in many areas of law (and life), context is crucial. Hence, to determine whether a particular parenthetical provides a definition or is "merely an illustrative example," Novacor Chems., Inc. v. United States, 171 F.3d 1376,1381 (Fed. Cir. 1999), we must consider the specific language at issue in the statutory or regulatory context in which it appears and then draw the most sensible conclusion about its meaning. …

56 F.4th at 971 (citations omitted).

The explicit parenthetical reference to one and only one kind of article in the exclusionary language indicates that the only reasonable approach to the interpreting this language is to construe it as a definitional, *eo nomine,* exclusion of GPUs. "An eo nomine designation, with no terms of limitation, will ordinarily include all forms of the named article." Hayes-Sammons Co. v. United States, 55 C.C.P.A. 69, 75 (1968).

Even if one were to construe the parenthetical reference to GPUs as an illustrative example, as the CIT did, it would still mean that all forms of the

19

specifically-named article would be excluded from assessments of 301 Tariffs. Since there is no material dispute as to the fact that the NVIDIA CMP 170HX GPU is a GPU or that the terms GPU and graphics processing module are used interchangeably, the subject merchandise indisputably falls within the meaning of the exclusionary language.

The fact that the subject merchandise does not have video outputs does not mean that it is not useful for rendering images onto computer screens.   The language of the GPU exclusion refers to "rendering images onto a computer screen," not just video signals.  In the electronics industry, rendering means:

> rendering (n)~ The creation of an image containing geometric models, using color and shading to give the image a realistic look. Usually part of a geometric modeling package such as a CAD program, rendering uses mathematics to describe the location of a light source in relation to the object and to calculate the way in which the light would create highlights, shading, and variations in color. The degree of realism can range from opaque, shaded polygons to images approximating photographs in their complexity.

Rigdon, Dictionary of Computer and Internet Terms (2016) (Ex. 28, Appx001340.)

One of the intended uses of the subject merchandise was for rendering images.  PSUMF 3, 22, 69 (Appx000095, Appx000098, Appx000106). The subject merchandise is capable of accelerating the processing of graphic image files and transmitting those image files through the PCIe connector to the motherboard.

PSUMF 18 (Appx000098).  The central processing unit on the server's motherboard is, in turn, able to use its built-in graphics display capabilities to display those image files on a computer screen. PSUMF 19 (Appx000098).  Thus, while the subject merchandise lacks a "video" output, the subject merchandise consists of GPUs that can be used to accelerate the process of rendering non-video images onto computer screens, by compiling graphics files and then transferring those images to the central processing unit board, which can display the images on a computer screen using the central processing unit's built-in graphics display capabilities.

b.      **The Subject Merchandise Consists of Printed Circuit Board Assemblies Constituting Unfinished Logic Boards**

The exclusionary language for logic boards covers: "Printed circuit assemblies, constituting unfinished logic boards." A logic board is defined by lexicographic authorities as: "An assembly of decision-making circuits on a printed-circuit mounting board."  IEEE 100 The Authoritative Dictionary of IEEE Standards Terms (Seventh Edition).   Motherboard Magazine answered the question of what is a logic board as follows:

> What is a logic board? | A logic board is a board containing a bunch of "logic gates." A logic board may also hold electronics other than logic gates. For example, a motherboard is a logic board. But it is

21

not necessary that every logic board will be a motherboard. Because most add-on cards inserted into your computer (such as Graphics Cards, Network Cards) are also logic boards.[2]

See also PSUMF 25 (Appx000099). The CMP 170HX GPU falls within the definition of a logic board because it is a printed circuit assembly containing a number of logic gates.

Given these undisputed facts, it is indisputable that the subject merchandise consists of printed circuit board assemblies ("PCBAs") constituting logic boards. PSUMF 13-15, 24 (Appx000097, Appx000098-99). The CIT agreed. *See* Slip Op. at 27 (Appx000031).

When the Court below turned to the question of whether these logic boards were "unfinished," the CIT relied upon a fundamental misunderstanding of GRI(2)(a) of the HTSUS.   The CIT's opinion states:

> In standard tariff classification analyses, the court has turned to the GRIs to determine whether merchandise classifiable under the relevant heading are "incomplete" or "unfinished." See Pomeroy Collection, Ltd. v. United States, 559 F. Supp. 2d 1374, 1386–87 (CIT 2008) (finding that "incomplete" candle lamps were classifiable as part of "complete, fully assembled candle lamps" if they have "the essential character of a complete candle lamp.") (citing GRI 2(a), "[a]ny reference in a heading to an article shall be taken to include a reference to that article incomplete … provided that, as presented, the incomplete … article has the essential character of the complete … article."). Here, for purposes of an exclusion under U.S. Note

---

[2] *https://motherboardmag.medium.com/what-is-a-logic-board-edc9df2d6c7c*

20(ttt)(iii)(110), the court finds that "unfinished" has the common meaning of lacking the "essential character" of the complete or finished article.

Slip Op. at 28 (Appx000032).

GRI(2)(a) provides that any reference in a heading to an article shall be taken to include a reference to that article incomplete or unfinished, provided that, as entered, the incomplete or unfinished article has the essential character of the complete or finished article. GRI(2)(a) answers the question whether admittedly unfinished articles are to be treated as finished articles. It does not answer the question of whether a particular article is "unfinished."

Using GRI (2)(a) in the manner used by the CIT renders the unfinished logic board exclusion a nullity. An article that lacks the essential character of a logic board would not be a logic board at all, which conflicts with the CIT's own finding that the subject merchandise does consist of logic boards. Limiting the unfinished logic board exclusion to articles that lack the essential character of a logic board would mean that no article could ever be an "unfinished" logic board because, in the CIT's view, once a printed circuit board assembly embodied enough characteristics to have the essential character of a logic board, it would immediately become a finished logic board, and be disqualified from the unfinished logic board exclusion. The reasoning of the CIT leads to the

23

conclusion that no printed circuit board assemblies could ever qualify as an unfinished logic board.

The CIT itself recognized in its analysis of the GPU Exclusion that the courts must not construe tariff terms in a manner that would render meaningless or inoperative, stating:

> Fundamental to the standard interpretative tools for tariff classifications, including as applied to section 301 exclusions, is the notion that "[w]hen interpreting HTSUS provisions, [courts] must strive to give effect to every word in the statutory text." Deckers Outdoor, 714 F.3d at 1371. In other words, "courts should construe the provisions of the tariff code in a way that avoids rendering terms redundant, meaningless, or inoperative." ME Global, 633 F. Supp. 3d at 1368.

Slip Op. at 23-24 (Appx000027-28).  Yet, that is precisely what the CIT does by applying GRI(2)(a) in the manner that renders the unfinished logic board exclusion a nullity.

There is, in fact, no genuine issue of material fact as to the unfinished state of the subject merchandise at the time of importation.  NVIDIA deliberately empowered the user/customers of the CMP 170hx GPU to modify the configuration file of the subject merchandise to meet their individual specifications.  PSUMF 52 (Appx000103).  Users were able to modify the configuration file of the subject merchandise to change, among other things, the

power rating, clock speed, and display configurations of the subject merchandise. PSUMF 53 (Appx000103). The subject merchandise was deliberately left in an unfinished state so it could be customized by the user. The CIT itself acknowledged that "Atlas had to flash (*i.e.* install) a new VBIOS onto the VRAM of the subject merchandise for it to function to Atlas' expected specifications." PSUMF 56 (Ex. 25, Def. Admission 29) (Appx000104 & Appx001285).

In the case of Atlas, the subject merchandise was also unfinished because it did not work at all in its condition as imported. When the subject merchandise was received by Atlas in Montana and Atlas tried to install the subject GPUs in its servers, Atlas discovered that the VBIOS software on the GPUs was not functional. Two witnesses, Hayden Gill and Lee Goodwyn, provided uncontroverted, sworn testimony that the subject merchandise was not operational in its condition as imported. PSUMF 55 (Appx000103). The Government's expert agreed under oath that there are no facts in the record of this case to suggest that the testimony of Mr. Gill and Mr. Goodwyn regarding the lack of functionality was untrue. *Id.*

After importation of the subject merchandise and discovery that the subject merchandise could not function at all, NVIDIA provided functioning VBIOS software to Atlas by allowing Atlas to download the VBIOS from a secure NVIDIA website. PSUMF 56-57 (Appx000104). When Atlas loaded the drivers

25

onto the servers and loaded the functional VBIOS onto the individual subject GPUs, the GPUs began to function as intended. PSUMF 56 (Appx000104).

The subject merchandise was also imported without the Linux drivers that are necessary to allow the CMP HX170 GPU to be used with an automated data processing machine. PSUMF 54 (Appx000103). The subject merchandise was imported without the application software needed to engage in cryptocurrency mining or any other data processing task. PSUMF 44 (Appx000102). After importation of the subject merchandise, NVIDIA provided the needed Linux drivers by allowing Atlas to download the drivers from an NVIDIA website. PSUMF 54 (Appx000103).

The CIT erred by completely disregarding several binding rulings by CBP finding that an electronic device imported without finished software is an "unfinished" electronic device. In ruling NY C86235 (April 9, 1998), CBP addressed the question whether a laptop computer containing an unloaded BIOS chip was an "unfinished" device. CBP stated:

> The BIOS chip contained in this otherwise complete laptop computer, contains a preparation program with a capacity of approximately 10K bytes in flash memory. The capacity of the full BIOS instruction program will be around 500K bytes and will be loaded onto the BIOS chip after importation in a manufacturing facility. The BIOS instructions will be loaded onto the chip by either downloading it to the laptop via local area network (LAN) or a floppy drive using a keyboard or mouse. Finally, a test program will be run

26

to ensure the full functionality of the laptop including the interaction with the operating system.

**\*\*\*\***

… GRI2(a) provides that any reference in a heading to an article shall be taken to include a reference to that article incomplete or unfinished, provided that, as presented, the incomplete or unfinished article has the essential character of the complete or unfinished article.  The subject laptop computer is an incomplete or unfinished digital processing unit, needing only the introduction of the full BIOS instruction code.  …

In HQ 962847(October 15, 1999), CBP considered whether a protest should be granted with respect to the question whether an Expendable Launch Vehicle Flight Computer (ELVFC) that lacked its application software at the time of importation was an unfinished navigational instrument.  CBP stated:

…The protestant maintains that when loaded with its application software, the ELVFC performs autopilot functions.  However, despite incorporating firmware which protestant terms "low-level" and which implements the required data processing and control algorithms, the ELVFC in this case is imported minus its application software.  It is, therefore, an incomplete or unfinished article. …

CBP ruled that the ELVFC should be classified as an incomplete or unfinished navigational instrument.

In HQ 957287 (August 9, 1995), CBP ruled that a notebook computer with non-operational BIOS chip was an unfinished automated data processing machine.

27

In that case, the BIOS code was loaded onto the BIOS chip after importation via a floppy diskette.

These binding rulings demonstrate that CBP has uniformly treated electronic devices imported without functioning software needed for their operation as "unfinished" articles for tariff purposes.  The undisputed facts in this case should lead the Court to the same conclusion.

The Court of Appeals for the Federal Circuit has recognized the importance of CBP's prior binding ruling regarding the classification of imported merchandise. In Optrex Am., Inc. v. United States, 475 F.3d 1367 (Fed. Cir. 2007), this Court stated with respect to the classification of automated data processing ("ADP") machines:

> We agree with the interpretation given to this requirement by Customs: "Customs believes that a freely programmable ADP machine is one that applications can be written for, does not impose artificial limitations upon such applications, and will accept new applications that allow the user to manipulate the data as deemed necessary by the user." HQ 964880 (Dec. 21, 2001) (emphasis added); accord HQ 956839 (Mar. 28, 1996); HQ 952862 (Nov. 1, 1994).

Optrex v U.S., 475 F.3d at 1370.  The CIT erred by ignoring CBP's binding rulings regarding what constitutes an "unfinished" electronic device.

CBPs treatment of electronic articles without essential software as unfinished is also consistent with the electronic industry's treatment of software as

28

a component of an electronic device. The IEEE 100 The Authoritative Dictionary of IEEE Standards Terms (Seventh Edition) defines component with regard to software as:

> Component:
> *****
> (5) (software) One of the parts that make up a system. A component may be hardware or software and may be subdivided into other components. …

Ex. 29 (Appx001343) (emphasis added). Similarly, Barron's Dictionary of Computer and Internet Terms defines component as "any part of a larger system, either software or hardware." Ex. 30 (Appx001346) (emphasis added).

Both CBP, in its binding rulings, and the electronics industry in general treat software as a component of an electronic device. Thus, a device like the CMP 170HX GPU that lacked drivers, application software or a functioning VBIOS at the time of importation was missing components that were needed for the subject merchandise to function at all and for it to function as intended. The subject merchandise was, therefore, unfinished in its condition as imported.

The subject merchandise consists of unfinished logic boards because, at the time of importation, the subject merchandise lacked the functioning software needed for it to operate as intended by the user. Moreover, the user was deliberately empowered to modify the subject merchandise to complete the

29

unfinished merchandise by modifying the configuration file to meet each customer's individual specifications.

## CONCLUSION AND RECOMMENDED APPELLATE REMEDY

In light of the foregoing, Plaintiff-Appellant requests that this Court enter judgment in its favor, reversing the judgment of the U.S. Court of International Trade and remanding the matter to the United States Court of International Trade for disposition of all remaining undecided issues.

Respectfully submitted,

/s/ J. Kevin Horgan

J. Kevin Horgan
Merisa A. Horgan
**DEKIEFFER & HORGAN, PLLC**
1015 Fifteenth St., N.W.
Washington, DC 20005
(202) 783-6900

May 04, 2026.

*Counsel for Plaintiff-Appellant*

ADDENDUM

**Protest Information:**

| | |
|---|---|
| **Protest Number:** | 410122102924 |
| **Protest Status:** | Denied |
| **Protest Process Status:** | Protest Decided |
| **Protest Decision Date:** | 2022-11-21 |
| **Protest Type:** | 514 Protest |
| **Date Received:** | 2022-10-26 |
| **Port Code:** | 4101 |
| **Team Number:** | GBA |
| **Lead Protest Number:** | |
| **Claimed Tariff Number:** | |
| **Denied Claim Number:** | |
| **Accelerated Disposition Requested:** | No |
| **Sample Provided:** | No |

**Issue/Reason for Protest**

**Primary Issue:**                    301 Remedy
**Secondary Issue:**
**Reason for Protest:** May 26, 2022, Post Summary Corrections (PSC) were filed on the below entries pursuant 87 FR 17380 published 3/28/2022 which reinstated certain exclusions to the section 301 investigation of China's acts, policies, and practices related to technology transfer, intellectual property, and innovation. • 8GF-2000360-5 Entry 10/05/21 Liquidation 08/12/22 • 8GF-2000378-7 Entry 11/01/21 Liquidation 08/12/22 • 8GF-2000380-3 Entry 11/12/21 Liquidation 08/12/22 • 8GF-2000384-5 Entry 11/17/21 Liquidation 08/12/22 August 3, 2022, Import Specialist Scott Titus rejected the PSC's for lack of documentation showing the Graphics Processing Units (GPU's) meet the description found in HTS Chapter 99 note 20(ttt)(iii)(109) in order to be excluded from section 301 duty using exclusion HTS 9903.88.67. • Printed Circuit assemblies to enhance the graphics performance of automatic data processing (ADP) machines "accelerator modules", described in 8473.30.1180. The issue of classification of the GPU's that Atlas imports was first challenged in January 2021 by Import Specialist Japhy O'Doherty on Entry 8GF-2000198-9. At that time the entry was filed on December 29, 2020 using the section 301 exclusion but the vessel did not arrive until January 4,2021, and the exclusion had expired. Atlas's attorneys verified the classification and a CF29 was issued on August 24, 2021 accepting the classification of 8473.30.1180 for the GPU's imported by Atlas. The products imported on these Entries are Nividia CMP 170HX Graphic Processing Units. These GPU's are being installed in high-performing data servers to generate graphic displays of a variety of potential applications. The Atlas data servers where these GPU's are installed handle a variety of potential workloads including but not limited to 3D scene rendering, biology simulations, artificial intelligence/neural network development, blockchain backed inventory and logistics management, and open computing language applications for cross-platform parallel programming. The CMP 170HX (image 1) is a professional-grade graphics card produced by NVIDIA. It is based on the GA100 (image 2) graphics processor which is a large chip with a die area of 826 mm² and 54,200 million transistors to reach the product's target shader count. It features 4480 shading units, 280 texture mapping units, and 128 ROP's. Also included are 280 tensor cores which help improve the speed of machine learning applications. NVIDIA has paired 16GB HBM2e memory with the CMP170HX. Please re-liquidate these entries using the section 301 exclusion HTS 9903.88.67 and refund the duty over-paid to the importer. Per CSMS 53441417 ACE Protest Module is not able to accept attachments. Please email Justin@customsgurus.com when this protest is being reviewed so I can provide the attachments on demand. Attachment 1 Ruling N304787; classification of similar merchandise Attachment 2 NVIDIA CMP HX Product data sheet Attachment 3 GPU Classification CF29 Attachment 4 GPU Classification Memo Attachment 5 GPU Image

**Entries**

| Entry Summary Number | Additional Protest Filed | Withdrawn |
|---|---|---|
| 8GF20003605 | N | No |
| 8GF20003845 | N | No |
| 8GF20003803 | N | No |
| 8GF20003787 | N | No |

**Party Information**

| | |
|---|---|
| **Importer of Record Number:** | 84-216450400 |
| **Importer of Record Name:** | ATLAS POWER LLC |
| **Importer of Record Address:** | 200 TECHNOLOGY WAY BUTTE MT 59701-9795 US |

| | |
|---|---|
| **Protest Filer Type:** | Broker |
| **Protest Filer Number:** | 82-357555300 |
| **Protest Filer Name:** | Customs Gurus |
| **Protest Filer Address:** | |

| | |
|---|---|
| **Protestant Type:** | Importer/Consignee |
| **Protestant Number:** | 84-216450400 |
| **Protestant Name:** | ATLAS POWER LLC |
| **Protestant Address:** | 200 TECHNOLOGY WAY BUTTE MT 59701-9795 US |

**Substitute Party Type:**
**Substitute Party Number:**
**Substitute Party Name:**
**Substitute Party Address:**

**Refund Party:**
**Refund Party Name:**
**Refund Party Address:**

**Decision**

| | |
|---|---|
| **Decision:** | Denied |
| **Comments:** | 514 Protest Denied. Based further research and product review the Product NVIDIA CMP 170HX with GA100-105F does not operate like ADP GPU specifically for graphics/video. MSS |
| **Supervisor Decision:** | Agree |
| **Comments:** | |

**AFR Information**

**AFR Request:**
  **Yes**    **No**    (A) Have you made prior request of a port director for a further review of the same claim

with respect to the same substantially similar merchandise?
 **Yes   No**   (B) Have you received a final adverse decision from the U.S. Court of International Trade on the same claim with respect to the same category of merchandise or do you have action involving such a claim pending before the U.S. Court of International Trade?
 **Yes   No**   (C) Have you previously received an adverse administrative decision from the Commissioner of CBP or his designee or have you presently pending an application for an administrative decision on the same claim with respect to the same category of merchandise?


**Justification for Further Review Under Criteria in 19 CFR 174.25 (including Application Ruling):**


**Port AFR Decision**


 **Decision:**
 **Date/Time:**
 **Preliminary Examination Findings:**


**Further Review Decision**


 **Decision:**
 **Date/Time:**
 **Comments:**


**Request Reconsideration of AFR Denial (1515(c)):**

**Requested By:**

**Date/Time:**

**Justification:**


**Reconsideration of AFR Denial Decision:**

**Decision:**

**Date/Time:**

**Comments:**


**Additional Arguments**

**Argument 1:**

**Submitted by:**

**Date/Time:**


**Post Decision Information**


**Request to Void Denial (1515(d)):**

**Requested By:**

**Date/Time:**

**Comments:**


**Request for Void Denial Decision:**

**Decision:**

**Date/Time:**

**Comments:**

Slip Op. 26-4

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| ATLAS POWER LLC, | |
| Plaintiff, | |
| v. | Before: Lisa W. Wang, Judge |
| UNITED STATES, | Court No. 23-00084 |
| Defendant. | |

**Opinion and Order**

[Granting in part and denying in part Plaintiff's motion for summary judgment and granting in part and denying in part Defendant's cross motion for summary judgment.]

Dated: January 27, 2026

J. Kevin Horgan, deKieffer & Horgan, PLLC, of Washington, D.C., argued for Plaintiff Atlas Power LLC. With him on the brief was Merisa A. Horgan.

Mathias Rabinovitch, Trial Attorney, U.S. Department of Justice, Civil Division, Commercial Litigation Branch, of New York, NY, argued for Defendant United States. With him on the brief were Brian M. Boynton, Principal Deputy Assistant Attorney General, Patricia M. McCarthy, Director, and Aimee Lee, Assistant Director. Of Counsel on the brief was Sabahat Chaudhary, Office of the Assistant Chief Counsel, International Trade Litigation, U.S. Customs and Border Protection.

Wang, Judge: Before the court are cross motions for summary judgment. Pl.'s Mot. for Summ. J. ("Pl.'s Mot."), ECF No. 45; Def.'s Cross Mot. for Summ. J. and Resp. in Opp. to Pl.'s Mot. for Summ. J. ("Def.'s Mot."), ECF No. 49. Plaintiff Atlas Power LLC ("Plaintiff" or "Atlas") challenges U.S. Customs and Border Protection's ("Customs") denial of its protest against the assessment of duties imposed under section 301 of the Trade Act of 1974 ("section 301 duties") on NVIDIA Crypto Mining Processor ("CMP")

Appx000005

Court No. 23-00084                                                                Page 2

170HX printed circuit assemblies ("imported merchandise" or "CMP Boards"), which

were imported by Plaintiff from October 5, 2021, through November 1, 2021. Third Am.

Compl. ¶ 1, ECF No. 39; see Trade Act of 1974, Pub. L. No. 93-618, 88 Stat. § 301,

1978, 2041 (1974) (codified as amended at 19 U.S.C. § 2411). Plaintiff argues that the

imported merchandise was properly classified by Customs under subheading

8473.30.1180 of the Harmonized Tariff Schedule of the United States ("HTSUS") and

meets the definitions of the exclusions from the assessment of section 301 duties

provided in U.S. Notes 20(ttt)(iii)(108) through (110). Pl.'s Mot. at 16; see also HTSUS

8473.30.1180 (2021). The United States ("Defendant" or "government") cross moves for

summary judgment, arguing that the imported merchandise is properly classified under

HTSUS subheading 8543.90.68 and, alternatively, even if the imported merchandise is

properly classified under HTSUS subheading 8473.30.1180, it does not meet the

definitions of the exclusions provided for in U.S. Notes 20(ttt)(iii)(108) through (110).[1]

Def.'s Mot. at 9; see also HTSUS 8543.90.68 (2021).

     For the following reasons, the court finds that the imported merchandise is:

(1) properly classified under HTSUS subheading 8473.30.1180; and (2) does not meet

---

[1] Defendant further claims that even if the CMP Boards fall within HTSUS subheading 8473.30.1180, a portion of the entries of imported merchandise are not covered by the retroactive application of the exclusions from section 301 duties. Def.'s Mot. at 10.

Because the court concludes that the imported merchandise does not meet the definitions of the exclusions set forth in U.S. Notes 20(ttt)(iii)(108) through (110) to be excluded from the assessment of section 301 duties, it need not consider the effective date of the retroactive exclusions.

Court No. 23-00084                                                                Page 3

the definitions of the exclusions provided in U.S. Notes 20(ttt)(iii)(108) through (110) as articles excluded from section 301 duties.

## BACKGROUND

### I.        Procedural Background

Plaintiff entered four shipments of the imported merchandise from the People's Republic of China ("PRC") into a foreign trade zone as privileged foreign merchandise in October and November of 2021. Summons, ECF No.1. Plaintiff subsequently entered the merchandise for consumption under cover of: (1) entry number 8GF-2000360-5 on October 5, 2021; (2) entry number 8GF-2000378-7 on November 1, 2021; (3) entry number 8GF-2000380-3 on November 12, 2021; and (4) entry number 8GF-2000384-5 on November 17, 2021. Id. On August 12, 2022, the entries auto liquidated at the classification and rate of duty asserted at the time of entry under HTSUS subheading 8473.30.1180, which provides for "Parts and accessories (other than covers, carrying cases and the like) suitable for use solely or principally with machines of headings 8470 to 8472 … parts and accessories of the machines of heading 8471 [i.e., automatic data processing machines]." Third Am. Compl. ¶ 12.

At the time of entry, PRC-origin merchandise classified under HTSUS subheading 8473.30.1180 was subject to section 301 duties of 25 percent ad valorem. See Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Relating to Technology Transfer, Intellectual Property, and Innovation, 83 Fed. Reg. 47,974, 47,975 (USTR Sept. 21, 2018). On March 28, 2022, the Office of the United States Trade Representative ("USTR") reinstated certain exclusions from section 301 duties that had previously been rescinded, making them retroactive to October 12,

Court No. 23-00084                                                    Page 4

2021. See Notice of Reinstatement of Certain Exclusions: China's Acts, Policies, and

Practices Related to Technology Transfer, Intellectual Property, and Innovation, 87 Fed.

Reg. 17,380, 17,382 (USTR Mar. 28, 2022) ("Reinstatement Notice").[2]

Plaintiff filed a timely protest[3] concerning the imported merchandise on October

26, 2022, which Customs denied on November 21, 2022. Third Am. Compl. ¶ 14. In its

protest decision, Customs did not alter the tariff classification of the imported

merchandise under HTSUS subheading 8473.30.1180 and found that the CMP Boards

did not meet the descriptions for the exclusions from the assessment of section 301

duties. Pl.'s Ex. In Supp. of Mot. for Summ. J., Ex. 2, ECF No. 45-3 at 1, Appx000063

("Atlas Protest Decision").

On April 19, 2023, Plaintiff commenced this action. Summons. Plaintiff filed a

motion for summary judgment on November 12, 2024. Pl.'s Mot. Defendant filed a cross

motion for summary judgment and response to Plaintiff's motion for summary judgment

on January 17, 2025. Def.'s Mot. On April 15, 2025, Plaintiff filed a reply in support of its

motion for summary judgment and a response to Defendant's cross motion for summary

judgment. Pl.'s Reply in Supp. of Mot. for Summ. J. & Resp. to Def.'s Cross Mot. for

Summ. J. ("Pl.'s Reply Br."), ECF No. 55. On May 20, 2025, Defendant filed a reply in

---

[2] The USTR announced that "the reinstated exclusions will apply to goods entered for consumption ... on or after ... October 12, 2021, that are not liquidated [or for which liquidation is not final]." Reinstatement Notice, 87 Fed. Reg. at 17,380 (USTR Mar. 28, 2022).

[3] In its protest, Plaintiff asserted that the imported merchandise was excluded from the assessment of section 301 duties as a result of the retroactive nature of the announced exclusions. Third Am. Compl. ¶ 14.

Court No. 23-00084                                                           Page 5

support of its cross motion for summary judgment. Def.'s Reply in Supp. of Cross Mot.

for Summ. J. ("Def.'s Reply Br."), ECF No. 58. On June 4, 2025, the court granted

Plaintiff's motion for leave to file a sur-reply and accepted Defendant's response to

Plaintiff's motion for leave to file a sur-reply. Pl.'s Mot. for Leave to File Sur-Reply, ECF

No. 59; Def.'s Resp. to Mot. for Leave to File Sur-reply, ECF No. 60. On June 4, 2025,

Plaintiff filed a sur-reply in further support of its argument. Pl.'s Sur-reply, ECF No. 62.

## II.      Description of the Imported Merchandise

The imported merchandise is the NVIDIA CMP 170HX, a printed circuit board

assembly ("PCA") incorporating: (1) a GA-100-105F-A1 graphics processing unit

("GPU")[4]; (2) eight gigabytes of onboard memory ("VRAM"); (3) eight megabits of

---

[4] A GPU is a specialized chip incorporated into a PCA that, when connected to a motherboard with a central processing unit ("CPU"), performs certain computations and tasks faster and more efficiently than a CPU alone. Pl.'s Ex. In Supp. of Mot. for Summ. J., Ex. 15, ECF No. 45-5 at 1, Appx001004 ("NVIDIA CMP 170HX Product Description Sheet"); see also What is a GPU?, Intel, https://www.intel.com/content/www/us/en/products/docs/processors/what-is-a-gpu.html (last visited Jan. 5, 2026).

The parties also use the term "GPU" to refer to the entire PCA, including the graphics processing chip and all other electrical and housing components incorporated onto the PCA. Def.'s Mot. at 3, n. 2; Pl.'s Mot. at 2–4.

For the purposes of this opinion, the term "GPU" hereinafter refers to a graphics processing chip or chipset that is mounted onto a PCA (i.e., the GA-100-105F-A1 GPU is incorporated onto the PCA of the CMP 170HX).

The term "graphics card" hereinafter refers to the fully assembled add-on peripheral card, including the PCA, the GPU, all other assembled components thereof, including any onboard memory, passive cooling system, power connectors, input and output interfaces, and any external enclosure or housing thereof. NVIDIA CMP 170HX Product Description Sheet at 1, Appx001004; Pl.'s Ex. In Supp. of Mot. for Summ. J., Ex. 4, ECF

Court No. 23-00084                                                    Page 6

electrically erasable programmable read-only memory ("EEPROM"); and (4) all other

electronic components such as capacitors, resistors, and other ancillary components;

which are (5) encased in a protective aluminum enclosure with connection ports for

power and extruding data transmission connectors. Pl.'s Ex. In Supp. of Mot. for Summ.

J., Ex. 7, ECF No. 45-4 at 10, Appx000235 ("Expert Rep. of Dr. Gerhard Beckmann");

Pl.'s Ex. In Supp. of Mot. for Summ. J., Ex. 10, ECF No. 45-4 at 18:13–19, Appx000510

("Dep. of NVIDIA Designee Yisheng Chen").

Cryptocurrency miners[5] use the imported merchandise for cryptocurrency mining

because the GPUs on the CMP Boards are equipped with numerous arithmetic logic

units that can carry out the mathematical computations necessary for cryptocurrency

mining in parallel. Third Am. Compl. ¶ 8.

---

No. 45-3 at ¶¶ 31–35, Appx000117 ("Atlas Expert Rep. of Dr. Sunil P. Khatri"); Expert Rep. of Dr. Gerhard Beckmann at 7, Appx000232.

[5] Cryptocurrency mining involves validating cryptocurrency transactions on a blockchain network and adding them to a distributed ledger. Each validation adds a new block on the ledger, and each block references the previous block, forming a blockchain. Validating transactions requires a powerful machine that can solve a complex mathematical (cryptographic) algorithm. When a "miner" solves this problem, it validates the transaction, which is then added to the blockchain as a new block, and the miner is then rewarded with a cryptocurrency coin. Mining Explained: A Detailed Guide on How Cryptocurrency Mining Works, Freeman Law, https://freemanlaw.com/mining-explained-a-detailed-guide-on-how-cryptocurrency-mining-works/ (last visited Jan. 5, 2026); see also Def.'s Mot. at 2, n. 1.

In 2021, Plaintiff "was the largest GPU-based cryptocurrency miner in North America." Pl.'s Statement of Material Facts Not In Disp. ("PSUMF") ¶ 2, ECF No. 45-2; Def.'s Resp. to Pl.'s Statement of Material Facts Not In Disp. ("Def.'s Resp. to PSUMF") ¶ 2, ECF No. 49-1.

Court No. 23-00084                                                                    Page 7

The merchandise was structurally optimized for mining cryptocurrency and does not incorporate a CPU or have a display output. PSUMF ¶¶ 17, 36; Def.'s Resp. to PSUMF ¶¶ 17, 36. The CMP Board must be connected to an automatic data processing ("ADP") device or system containing a CPU to function. PSUMF ¶ 37; Def.'s Resp. to PSUMF ¶ 37. The CMP Board connects to the motherboard[6] and CPU via a peripheral component interconnect express ("PCIe") data link interface slot.[7] Connecting the imported merchandise to an ADP machine does not prevent the ADP machine from running other data processing applications. Dep. of NVIDIA Designee Yisheng Chen at 109:8–11, Appx000601.

After importation, Plaintiff installed certain software drivers for use with a Linux-based operating system onto its servers. PSUMF ¶ 56; Def.'s Statement of Material Facts Not In Disp. ("DSUMF") ¶ 40, ECF No. 45-2. The operating system was specifically designed by a third-party supplier, Elio VP, to run cryptocurrency mining operations. PSUMF ¶ 68; DSUMF ¶ 36.

---

[6] The motherboard is the main printed circuit board in a computer, and includes a CPU socket, RAM slots, expansion slots (including PCIe slots), and various input/output ports. It acts as the central backbone connecting all parts of a computer, allowing communication between the CPU, memory, and peripherals. Expert Rep. of Dr. Gerhard Beckmann at 5, Appx000230.

[7] PCIe is a standardized connection structure that provides the exchange of data and power between a motherboard-mounted CPU and peripheral hardware such as graphics cards or network communications devices that expand the functionality or capabilities of a CPU. Definition - Peripheral Component Interconnect Express (PCIe, PCI-E), TechTarget, https://www.techtarget.com/searchdatacenter/definition/PCI-Express (last visited Jan. 5. 2026); What is PCIe and How Does It Work?, Lenovo, https://www.lenovo.com/us/en/glossary/what-is-pcie/index.html (last visited Jan 5. 2026).

Court No. 23-00084                                                    Page 8

During production, the CMP Board's EEPROM was programmed with video basic input/output system ("VBIOS") firmware, which was installed prior to entry into the United States. Dep. of NVIDIA Designee Yisheng Chen at 55:3–4, Appx000547; Pl.'s Ex. In Supp. of Mot. for Summ. J., Ex. 12, ECF No. 45-4 at 193:20–24, Appx000918 ("Dep. of Dr. Gerhard Beckmann"). VBIOS firmware is designed to allow a motherboard with a CPU and operating system to initialize the CMP Board in the operating system. Dep. of NVIDIA Designee Yisheng Chen at 53:11–54:11, Appxs000545–000546.

At the time of importation, the CMP Board's VBIOS firmware did not function at the speed expected by Plaintiff. Pl.'s Ex. In Supp. of Mot. For Summ. J., Ex. 8, ECF No. 45-4 at 117:8–21, Appx000360 ("Dep. of Hayden Gill"). Based on Plaintiff's request, NVIDIA provided Atlas with updated VBIOS firmware via electronic download, allowing the CMP Boards to function at the speed preferred by Plaintiff. PSUMF ¶ 55; DSUMF ¶ 44. After importation, Atlas downloaded the updated VBIOS firmware and installed it onto each individual CMP Board. PSUMF ¶ 55; DSUMF ¶ 44.

### III.   Section 301 of the Trade Act of 1974

Section 301 of the Trade Act of 1974 authorizes the USTR to impose duties to protect U.S. interests when foreign trade partners violate trade agreements or otherwise take actions adverse to U.S. trade interests. See Trade Act of 1974, Pub. L. No. 93-618, 88 Stat. § 301, 1978, 2041; ARP Materials, Inc. v. United States, 520 F. Supp. 3d 1341, 1347 (CIT 2021). Section 301 duties are assessed after Customs classifies imported merchandise under applicable HTSUS subheadings. See, e.g., Notice of Product Exclusions: China's Acts, Policies, and Practices Related to Technology Transfer,

Court No. 23-00084                                                                          Page 9

Intellectual Property, and Innovation, 84 Fed. Reg. 37,381 (USTR July 31, 2019) ("Exclusion Notice").

Pursuant to its authority under section 301, in 2017, the USTR undertook an investigation of certain trade practices in the PRC. Initiation of Section 301 Investigation; Hearing; and Request for Public Comments: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation, 82 Fed. Reg. 40,213 (USTR Aug. 24, 2017). After determining that the PRC's conduct was actionable under the statute, the USTR proposed an additional 25 percent ad valorem duty on various products imported from the PRC. Notice of Determination and Request for Public Comment Concerning Proposed Determination of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation, 83 Fed. Reg. 14,906, 14,907 (USTR Apr. 6, 2018). Following its notice of proposed action, the USTR imposed section 301 duties on certain additional goods from the PRC by adding new subheadings into the relevant HTSUS subheadings, including on the imported merchandise. Notice of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation, 83 Fed. Reg. 40,823, 40,825 (USTR Aug. 16, 2018) ("Action Notice").

In March 2022, prior to liquidation of the imported merchandise, the USTR retroactively reinstated certain exclusions from the section 301 duties imposed in 2018. Specifically, the list of excluded products set forth in HTSUS subheading 9903.88.56 included:

Court No. 23-00084                                                                    Page 10

> (108) Printed circuit assemblies for rendering images onto computer screens ("graphics processing modules") (described in statistical reporting number 8473.30.1180);
>
> (109) Printed circuit assemblies to enhance the graphics performance of automatic data processing (ADP) machines ("accelerator modules") (described in statistical reporting number 8473.30.1180); and
>
> (110) Printed circuit assemblies, constituting unfinished logic boards (described in statistical reporting number 8473.30.1180).

U.S. Notes 20(ttt)(iii)(108)–(110), Ch. 99, HTSUS; see Reinstatement Notice, 87 Fed. Reg. at 17,380 (USTR Mar. 28, 2022).

The USTR's retroactive exclusions were not self-executing, meaning that an importer seeking a refund of section 301 duties must have first filed a protest to Customs' liquidation classifying the imports as subject to the section 301 duties. See, e.g., CSMS No. 3919565 – Guidance: Seventh Round of Products Excluded from Section 301 Duties (Tranche 2), U.S. Customs & Border Prot. (2019); ARP Materials, 520 F. Supp. 3d at 1350. The 2018 announcement of section 301 duties specified that importers could request an exclusion of specific products classified within an affected tariff heading from the collection of such duties. Specifically, importers seeking exclusions should identify "the particular product in terms of the physical characteristics ... that distinguish it from other products within the covered 8-digit subheading." Action Notice, 83 Fed. Reg. at 47,236–37 (USTR Aug. 16, 2018); ARP Materials, 520 F. Supp. 3d at 1348–1349.

The USTR would "not consider [exclusion] requests that identif[ied] the product at issue in terms of the identity of the producer, importer, ultimate consumer, actual use or chief use, or trademark or tradenames." ARP Materials, 520 F. Supp. 3d at 1348–1349.

Court No. 23-00084                                                                                          Page 11

Rather, the exclusions were "product-specific," meaning that the grant of an exclusion in response to one importer's application would apply to like products imported by other entities. Id. at 1349; Exclusion Notice, 84 Fed. Reg. at 37,382 (USTR July 31, 2019).

**JURISDICTION & STANDARD OF REVIEW**

The court has jurisdiction over this action. 28 U.S.C. § 1581(a) ("The Court of International Trade shall have exclusive jurisdiction of any civil action commenced to contest the denial of a protest, in whole or in part, under section 515 of the Tariff Act of 1930.").

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." CIT R. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). Specifically, "[i]n a tariff classification dispute, summary judgment is appropriate only when 'there is no genuine dispute as to the nature of the merchandise and the classification determination turns on the proper meaning and scope of the relevant tariff provisions.'" Second Nature Designs Ltd. v. United States, 660 F. Supp. 3d 1352, 1373 (CIT 2023) (quoting Deckers Outdoor Corp. v. United States, 714 F.3d 1363, 1371 (Fed. Cir. 2013)); Tyco Fire Prods. L.P. v. United States, 918 F. Supp. 2d 1334, 1339 (CIT 2013) (quoting Bausch & Lomb, Inc. v. United States, 148 F.3d 1363, 1365 (Fed. Cir. 1998)) ("Where tariff classification is at issue, 'summary judgment is appropriate when there is no genuine dispute as to the underlying factual issue of exactly what the merchandise is.'").

Appx000015

Faced with cross motions for summary judgment, the court will "evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." Second Nature Designs, 660 F. Supp. 3d at 1381 (quoting Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1391 (Fed. Cir. 1987)); see also Plexus Corp. v. United States, 489 F. Supp. 3d 1379, 1388 (CIT 2020) (quoting Am. Fiber & Finishing, Inc. v. United States, 121 F. Supp. 3d 1273, 1279 (CIT 2015)) ("[E]ach party carries the burden on its own motion to show entitlement to judgment as a matter of law after demonstrating the absence of any genuine disputes over material facts.").

## I.     Judicial Review in Tariff Classification Cases

The court must "reach a correct result" in a tariff classification dispute. Jarvis Clark Co. v. United States, 733 F.2d 873, 878 (Fed. Cir. 1984). The court "must consider whether the government's classification is correct, both independently and in comparison with the importer's alternative." Id. While the court affords deference to Customs' classification rulings relative to their "power to persuade," it has "an independent responsibility to decide the legal issue of the proper meaning and scope of the HTSUS terms." ME Global, Inc. v. United States, 633 F. Supp. 3d 1349, 1356 (CIT 2023); see also United States v. Mead Corp., 533 U.S. 218, 235 (2001) (quoting Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944)); see also Warner-Lambert Co. v. United States, 407 F.3d 1207, 1209 (Fed. Cir. 2005).

The plaintiff bears the burden of establishing that Customs' classification of the imported merchandise was incorrect:

Court No. 23-00084                                                                                    Page 13

> Specifically, the importer must produce evidence (the burden of production portion of the burden of proof) that demonstrates by a preponderance (the burden of persuasion portion of the burden of proof) that Customs' classification decision is incorrect. The presumption of correctness certainly carries force on any factual components of a classification decision, such as whether the subject imports fall within the scope of the tariff provision, because <u>facts</u> must be proven via <u>evidence</u>.

<u>Universal Elecs., Inc. v. United States</u>, 112 F.3d 488, 492 (Fed. Cir. 1997) (emphases in original); <u>see also</u> <u>Jarvis Clark</u>, 733 F.2d at 878.

The United States Court of Appeals for the Federal Circuit ("Federal Circuit") has explained:

> First, we ascertain the meaning of the terms within the relevant tariff provision and, second, we determine whether the merchandise fits within those terms. The first step presents a question of law that we review de novo, whereas the second involves a question of fact that we review for clear error. When, as here, no genuine dispute exists as to the nature of the subject merchandise, the two-step inquiry "collapses into a question of law [that] we review de novo."

<u>Well Luck Co. v. United States</u>, 887 F.3d 1106, 1110 (Fed. Cir. 2018) (citations omitted). Where "there is no factual dispute regarding the merchandise, its structure and use, the resolution of the classification issue turns on the first step, determining the proper meaning and scope of the relevant tariff provisions." <u>Faus Group, Inc. v. United States</u>, 581 F.3d 1369, 1372 (Fed. Cir. 2009).

The General Rules of Interpretation ("GRIs") "govern the classification of goods within the HTSUS." <u>Well Luck</u>, 887 F.3d at 1111. In order "[t]o determine the meaning of an HTSUS provision, the court applies the GRIs in numerical order, beginning with GRI 1 and reaching subsequent GRIs if analysis under the preceding GRI does not yield proper classification of the subject merchandise." <u>Amcor Flexibles Kreuzlingen AG v. United States</u>, 560 F. Supp. 3d 1326, 1330 (CIT 2022). Under GRI 1, "classification

Court No. 23-00084                                                          Page 14

shall be determined according to the terms of the headings and any relative section or

chapter notes." GRI 1; see also Orlando Food Corp. v. United States, 140 F.3d 1437,

1440 (Fed. Cir. 1998).

HTSUS terms "shall be considered to be statutory provisions of law for all

purposes." Omnibus Trade and Competitiveness Act of 1988, Pub. L. No. 100-418,

§ 1204(c)(1), 102 Stat. 1107, 1149; Libas, Ltd. v. United States, 193 F.3d 1361, 1364

(Fed. Cir. 1999) ("[The] HTSUS is indeed a statute but is not published physically in the

United States Code."). When "a tariff term is not defined in either the HTSUS or its

legislative history, the term's correct meaning is its common or dictionary meaning in the

absence of evidence to the contrary." Russell Stadelman & Co. v. United States, 242

F.3d 1044, 1048 (Fed. Cir. 2001); see also Carl Zeiss, Inc. v. United States, 195 F.3d

1375, 1379 (Fed. Cir. 1999) ("Absent contrary legislative intent, HTSUS terms are to be

construed according to their common and commercial meanings, which are presumed

to be the same.").

The court may interpret the terms of a tariff provision by "rely[ing] upon its own

understanding of the terms used and may consult lexicographic and scientific

authorities, dictionaries, and other reliable information sources." Carl Zeiss, 195 F.3d at

1379. The court may also consult Explanatory Notes ("ENs") published by the World

Customs Organization "[f]or additional guidance on the scope and meaning of tariff

headings and chapter and section notes." DIS Vintage LLC v. United States, 456 F.

Supp. 3d 1323, 1329 (CIT 2020). ENs are "not binding law," but they are "generally

Court No. 23-00084                                                                    Page 15

indicative of the proper interpretation of a tariff provision." Id. (quoting Agfa Corp. v.

United States, 520 F.3d 1326, 1329 (Fed. Cir. 2008)).

## DISCUSSION

Here, there is no material issue in dispute as to the nature of the imported

merchandise. See Well Luck, 887 F.3d at 1110; Faus Group, 581 F.3d at 1372. The

parties disagree as to: (1) the proper classification of the imported merchandise; and (2)

the applicability of certain exclusions granted by the USTR from section 301 duties to

the imported merchandise. The court addresses each in turn.

I.      **The Imported Merchandise is Properly Classified Under HTSUS
        Subheading 8473.30.1180**

At the time of importation, Customs classified the imported merchandise under

HTSUS subheading 8473.30.1180, dutiable at a rate of 25 percent ad valorem, which

covers, among other things, parts and accessories of ADP machines. Pl.'s Mot. at 2;

Def.'s Mot. at 8; HTSUS 8473.30.1180 (2021) ("8473: Parts and accessories (other than

covers, carrying cases and the like) suitable for use solely or principally with machines

of headings 8470 to 8472: Parts and accessories of the machines of heading 8471: Not

incorporating a cathode ray tube: Printed circuit assemblies: Other.").

Plaintiff maintains that Customs' classification is correct[8]; that is, the CMP

Boards were properly classified under HTSUS subheading 8473.30.1180 as "parts or

---

[8] Plaintiff misconstrues the court's responsibility with respect to the correct classification of the imported merchandise. Specifically, Plaintiff argues that the court "should summarily sustain the classification of the subject merchandise under HTSUS subheading 8473.30.1180" because Defendant failed to assert an alternative classification "at the time of liquidation or in response to Atlas's protest against the assessment of Section 301 duties on the subject merchandise." Pl.'s Mot. at 16.

Court No. 23-00084                                                                    Page 16

accessories" of ADP machines. Pl.'s Mot. at 13. Plaintiff argues that the imported

merchandise is properly classified under HTSUS subheading 8473.30.1180 because it

is parts and accessories suitable for use solely or principally with Plaintiff's servers,

which are ADP machines. Pl.'s Reply Br. at 4–14. Defendant disagrees. Def.'s Mot. at

14.

      Before this court, Defendant asserts that the imported merchandise is properly

classified under HTSUS subheading 8543.90.68. Def.'s Mot. at 12–18; see also HTSUS

8543.90.68 (2021) ("Electrical machines and apparatus, having individual functions, not

specified or included elsewhere in this chapter; parts thereof … Parts: … Other: Printed

circuit assemblies: … Other.").

      After independently considering other tariff classifications, see Jarvis Clark, 733

F.2d at 878, and finding no other alternatives, the court concludes that the imported

merchandise would be properly classified under HTSUS subheading 8473.30.1180 if it

satisfies the following requirements: (1) the merchandise constitutes a "part" or an

"accessory"; (2) of an ADP machine; and (3) is "solely or principally" used for such a

machine. See HTSUS 8473.30.1180 (2021). The court agrees with Defendant that if all

three requirements are not satisfied, the imported merchandise would be classified

---

Regardless of Defendant's position with respect to the classification of imported
merchandise, the court has an independent duty to arrive at "the correct result, by
whatever procedure is best suited at hand." Jarvis Clark, 733 F.2d at 876–878. To reach
such a result, the court "must consider whether the government's classification is
correct, both independently and in comparison with the importer's alternative." Id. at
878. As such, the court cannot summarily sustain any classification proffered by the
parties.

Court No. 23-00084                                                                                  Page 17

under HTSUS subheading 8543.90.68, which is a residual provision for parts of electrical machines that are "not specified or included elsewhere" in the chapter. HTSUS 8543.90.68 (2021).

With respect to the first requirement, neither the HSTUS nor the ENs define the term "part" or "accessory." As such, the court turns to the dictionary or common meaning of the words. Russell Stadelman & Co., 242 F.3d at 1048. The dictionary meaning of "part" is "a constituent member of a machine or other apparatus." Part, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/part (last visited Jan. 5, 2026). Similarly, "accessory" is defined as "an object or device that is not essential in itself but adds to the beauty, convenience, or effectiveness of something else." Accessory, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/accessory (last visited Jan. 5, 2026).

The CMP Boards at issue cannot perform computational tasks independently and must be connected to a machine with a CPU in order to function. PSUMF ¶ 37; Def.'s Resp. to PSUMF ¶ 37. Because the CMP Boards cannot function independently of such a machine, they would not be considered either "machines of heading 8471" (i.e., ADPs) or independent electrical machines and apparatus, but rather are a "part" of such devices. Once connected, the CMP Boards add to the effectiveness of the machine. See Third Am. Compl. ¶ 8. As such, the CMP Board may also be considered an "accessory" of the machine.

Having found that the merchandise is a part or accessory of a machine, the court now turns to whether the Atlas servers would fall under HTSUS heading 8471

Appx000021

Court No. 23-00084                                                           Page 18

("automatic data processing machines and units thereof"). HTSUS 8471 (2021). Note

5(A) to Chapter 84, HTSUS defines ADP machines as "digital machines" capable of:

> (i) storing the processing program or programs and at least the data immediately necessary for execution of the program;
> (ii) being freely programmed in accordance with the requirements of the user;
> (iii) performing arithmetical computations specified by the user; and
> (iv) executing, without human intervention, a processing program which requires them to modify their execution, by logical decision during the processing run.

Note 5(A), Ch. 84, HTSUS (2021).

The parties dispute whether Plaintiff's servers constitute ADP machines because

of their ability (or inability) to be "freely programmed in accordance with the

requirements of the user."[9] Def.'s Mot. at 14; Pl.'s Reply Br. at 6. The Federal Circuit

has explained that "a freely programmable ADP machine is one that applications can be

written for, does not impose artificial limitations upon such applications, and will accept

new applications that allow the user to manipulate the data as deemed necessary by

the user." Optrex Am., Inc. v. United States, 475 F.3d 1367, 1370 (Fed. Cir. 2007)

(emphasis in original).

Defendant argues that the "pre-installed and custom-made" Linux operating

system running on Plaintiff's servers "[did] not allow for general purpose computing

tasks" and "[did] not allow the user to manipulate any data." Def.'s Reply Br. at 14–15.

---

[9] The parties do not dispute, and the court agrees, that Plaintiff's servers meet the requirements of Note 5(A)(i), (iii), and (iv) to Chapter 84, HTSUS.

Court No. 23-00084 Page 19

Rather, "the machines were limited to the singular function of mining cryptocurrency." Id. at 15.

However, Defendant's own expert witness contradicts this assertion. Specifically, the government's expert explained that a user, like Plaintiff, "could remove the Linux operating system and install a new Linux or a new operating system of some kind" should it want its servers to perform another function. Dep. of Dr. Gerhard Beckmann at 173:2–17, Appx000898. Adding the CMP Boards to a CPU would not prevent the CPU "from performing other functions like running a spreadsheet or word processing or things like that." Id. at 117:10–17, Appx000898.

When Plaintiff was dissatisfied with the speed of its VBIOS firmware, the manufacturer provided updated firmware to program or modify its speed. PSUMF ¶¶ 56–57; DSUMF ¶¶ 44–46. Further, in addition to the manufacturer, Plaintiff's third-party supplier of the CMP Boards, ElioVP, was able to program a Linux-based operating system for Plaintiff's servers to optimize Plaintiff's cryptocurrency mining requirements. Dep. of Hayden Gill at 71:1–71:12, Appx000314. Such record evidence establishes that Plaintiff's servers are capable of accepting new applications that allow the user to manipulate the data as deemed necessary by the user, and such servers do not impose artificial limitations upon such applications. See Optrex Am., 475 F.3d at 1370.

Having found that the CMP Boards are "parts" suitable for use with "machines of heading 8471" (i.e., ADPs), the final issue is whether the CMP Boards are "solely or principally" used for such machines. By its plain language, HTSUS subheading 8473.30.1180 is a "use" provision. Schlumberger Tech. Corp. v. United States, 845 F.3d

Court No. 23-00084                                                      Page 20

1158, 1164 (Fed. Cir. 2017) (explaining that "[a]n eo nomine provision 'describes an article by a specific name,' whereas a use provision describes articles according to their principal or actual use."); see also Primal Lite, Inc. v. United States, 182 F.3d 1362, 1364 (Fed. Cir. 1999). The Federal Circuit has explained that "principal use" is defined as the use "which exceeds any other single use." Aromont USA, Inc. v. United States, 671 F.3d 1310, 1312 (Fed. Cir. 2012) (emphasis in original).

The record demonstrates that the CMP Boards were designed for professional mining of cryptocurrency and must be incorporated onto an ADP machine in order to function. Dep. of Hayden Gill at 166:7–10, Appx000409; Atlas Expert Rep. of Dr. Sunil P. Khatri at ¶ 25, Appx000115; NVIDIA CMP 170HX Product Description Sheet at 1, Appx001004. In other words, the CMP Boards operate only as subordinate peripheral components controlled by the CPU-based system. Disconnected from a motherboard's PCIe slot, the CMP Boards have no independent functionality or usefulness. See PSUMF ¶ 37; Def.'s Resp. to PSUMF ¶ 37. As such, their principal use, which exceeds any other single use, is with ADP machines.

The court finds that the CMP Boards are properly classified under HTSUS subheading 8473.30.1180. HTSUS subheading 8543.90.68 does not apply, as it is a residual provision covering machines "not specified or included elsewhere." Rollerblade, Inc. v. United States, 116 F. Supp. 2d 1247, 1251 (CIT 2000), aff'd, 282 F.3d 1349 (Fed. Cir. 2002) ("[c]lassification of imported merchandise in a basket provision is only appropriate if there is no tariff category that covers the merchandise more specifically.").

Court No. 23-00084                                                    Page 21

**II.      The Imported Merchandise Does Not Qualify for an Exclusion from Section 301 Duties**

Having found that the imported merchandise is properly classified under HTSUS

subheading 8473.30.1180, the court must now decide whether such merchandise falls

within the description of one of the exclusions set forth in U.S. Notes 20(ttt)(iii)(108)

through (110) as articles excluded from section 301 duties.

The USTR's notice announcing the exclusions does not provide guidance on the

interpretative tools that should be used in determining the meaning of its terms.

Reinstatement Notice, 87 Fed. Reg. 17,380 (USTR Mar. 28, 2022). The parties also do

not provide alternative interpretative tools. As such, the court finds that "there is no

basis to depart from the standard rules of tariff interpretation for the Section 301

exclusion provisions." Keystone Auto. Operations, Inc. v. United States, 781 F. Supp. 3d

1362, 1373 (CIT 2025); see also Well Luck, 887 F.3d at 1110–1111.

**A.      Graphics-Related Exclusions**

U.S. Note 20(ttt)(iii)(108) covers "[p]rinted circuit assemblies for rendering images

onto computer screens ('graphics processing modules') (described in statistical

reporting number 8473.30.1180)." Further, U.S. Note 20(ttt)(iii)(109) covers "[p]rinted

circuit assemblies to enhance the graphics performance of automatic data processing

(ADP) machines ('accelerator modules') (described in statistical reporting number

8473.30.1180)."

The government argues that the imported merchandise cannot be excluded from

the assessment of section 301 duties under U.S. Note 20(ttt)(iii)(108) because the CMP

Boards are "physically incapable of rendering images onto a computer screen." Def.'s

Court No. 23-00084                                                                    Page 22

Mot. at 20. Similarly, the government argues that the imported merchandise cannot be

excluded from the assessment of duties under U.S. Note 20(ttt)(iii)(109) as it does not

enhance the graphics performance of ADP machines because it "cannot generate,

manipulate, construct, [and is not ] … otherwise involved in the graphics performance of

another machine." Def.'s Mot. at 24.

Plaintiff contends that the imported merchandise falls within the scope of U.S.

Note 20(ttt)(iii)(108) because the note's parenthetical reference to "graphics processing

modules" should be construed broadly to encompass all GPUs. Pl.'s Mot. at 22.

Similarly, Plaintiff argues that the imported merchandise should be covered by U.S.

Note 20(ttt)(iii)(109) because it is "capable of accelerating the processing of graphic

image files and transmitting those image files through the PCIe connector to the

motherboard." Pl.'s Mot. at 25. In the alternative, Plaintiff argues that the parenthetical

reference to "accelerator modules" in the text of the exclusion should be construed as

an eo nomine tariff provision, which would exclude all forms of accelerator modules

from the assessment of section 301 duties, regardless of their actual use. Id. at 22–25

(citing Hanser v. McDonough, 56 F.4th 967 (Fed. Cir. 2022)).

Key to both U.S. Notes 20(ttt)(iii)(108) and (109) are the terms "images" and

"graphics." U.S. Note 20(ttt)(iii)(108) ("[p]rinted circuit assemblies for rendering

images"); U.S. Note 20(ttt)(iii)(109) (PCAs "to enhance the graphics performance" of

ADPs). Using the interpretative tools provided in tariff classification cases, the court

finds that "terms are to be construed according to their common and commercial

meanings, which are presumed to be the same." Carl Zeiss, 195 F.3d at 1379. The

common industry meaning of "graphics" is "[t]he computer's display system" or "[t]he creation and manipulation of picture images." See Graphics, Computer Glossary, https://www.computerlanguage.com/results.php?definition=graphics (last visited Jan. 5, 2026). Similarly, the term "image" is "[a] picture; graphic; photo." See Image, ComputerLanguage.com, https://www.computerlanguage.com/results.php?definition=image (last visited Jan. 5, 2026). Industry definitions use the terms interchangeably, and include "picture" to convey the requirement that graphics and images are visual representations.[10]

Thus, for an exclusion of a PCA which "renders" images onto computer screens to apply, that PCA must cause a picture, graphic, or photo to display on such screens.[11] Similarly, for an exclusion of a PCA to enhance the graphics performance of an ADP machine to apply, that PCA must enhance the performance of the creation and manipulation of picture images on an ADP machine, rather than enhance the performance of an ADP machine generally.

Fundamental to the standard interpretative tools for tariff classifications, including as applied to section 301 exclusions, is the notion that "[w]hen interpreting HTSUS provisions, [courts] must strive to give effect to every word in the statutory text." Deckers

---

[10] See Picture, Dictionary.com, https://www.dictionary.com/browse/picture (last visited Jan. 5, 2026) (defining "picture" as "a visual representation of a person, object, or scene" and "any visible image, however produced.").

[11] See Render, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/render (last visited Jan. 5, 2026) (defining "render" in the context of computers as "to cause (something, such as an image or text) to display (as on a screen): to process for display on a computer screen.").

Court No. 23-00084                                                    Page 24

Outdoor, 714 F.3d at 1371. In other words, "courts should construe the provisions of the

tariff code in a way that avoids rendering terms redundant, meaningless, or inoperative."

ME Global, 633 F. Supp. 3d at 1368.

Here, the plain language of U.S. Notes 20(ttt)(iii)(108) and (109) requires a

graphics-related function to qualify for the exclusions. The CMP Boards do not meet

such a requirement.

Plaintiff has offered no evidence that the imported merchandise is used to render

or process graphics. Rather, the record demonstrates that the CMP Boards lack the

capability to render images on a computer screen because graphics rendering features

were explicitly disabled. As Plaintiff's expert witness, Dr. Khatri, explained:

> The deposition testimony of [the CMP Board's manufacturer, NVIDIA]
> indicates that the CMP 170HX GPU card was designed specifically for
> operations other than graphics rendering – for coin mining, in particular. In
> fact graphics rendering features were explicitly disabled in this card.

Atlas Expert Rep. of Dr. Sunil P. Khatri at ¶ 60, Appx000122 (citing Dep. of NVIDIA

Designee Yisheng Chen at 44:23–45:14, Appxs000536–000537); see also Matt

Wuebbling, GeForce Is Made for Gaming, CMP Is Made to Mine, NVIDIA Blog (Feb. 18,

2021), https://blogs.nvidia.com/blog/geforce-cmp (last visited Jan. 5, 2026).

Dr. Khatri further clarified that the CMP Boards were "designed specifically for …

coin mining" because:

> …[I]n the manufacturing process NVIDIA "re-purposed" GPUs that were
> capable of generating graphics by intentionally omitting (and permanently
> disabling) certain components and features. For example, the output
> display was disabled. Also, NVIDIA limited the PCIe speed on the CMP
> products and also the number of PCIe lanes to 4, because PCIe lane speed
> and bandwidth is not important for crypto mining, thus saving power and

energy. 3D rendering capabilities were removed, since crypto mining does not require this functionality. The video/audio engine was also removed.

Atlas Expert Rep. of Dr. Sunil P. Khatri at ¶ 46, Appx000120 (emphasis added); NVIDIA CMP 170HX Product Description Sheet at 1, Appx001004 (stating "Display Outputs: None" and specifying that the CMP 170HX does not have capabilities for graphics processing or rendering such as tensor processing, ray tracing, a video/audio engine, or a video encode/decode engine). As the NVIDIA representative, Mr. Chen, described of the CMP Boards, "we removed that graphics output function, so there's no display." Dep. of NVIDIA Designee Yisheng Chen at 108:7–9, Appx000600.

The evidence of the manufacturer's limitations to the output display of the GPU and the removal of the video engine demonstrate that the CMP Boards do not render images or graphics for display, as required by U.S. Note 20(ttt)(iii)(108). The CMP Boards also do not fall under the exclusion provided by U.S. Note 20(ttt)(iii)(109) because they cannot enhance the performance of a function (i.e., the processing of graphics) that was "intentionally" omitted by the manufacturer.

Plaintiff's arguments regarding a proposed eo nomine interpretation of "graphics processing modules" and "accelerator modules" likewise fail because they improperly divorce the parenthetical from the operative language of the exclusion. Plaintiff's reliance on Hanser is misplaced. As the Federal Circuit explained in that case, "[t]here is no general rule or presumption that a parenthetical is always definitional. Instead, as in many areas of law (and life), context is crucial." Hanser, 56 F.4th at 971. Here, if the court were to find that the parenthetical reference to "graphics processing modules" in U.S. Note 20(ttt)(iii)(108) covers all GPUs, or that the parenthetical reference to

Court No. 23-00084                                                                    Page 26

"accelerator modules" in U.S. Note 20(ttt)(iii)(109) covers all accelerator modules

regardless of use, it would render redundant and meaningless the limiting phrases of:

(1) "for rendering images onto computer screens" in U.S. Note 20(ttt)(iii)(108); and (2)

"to enhance the graphics performance" of an ADP machine in U.S. Note 20(ttt)(iii)(109).

Instead, and giving meaning to the limiting phrases of the notes, the court finds that the

parenthetical references are "illustrative examples" of the preceding description, and not

a standalone definitional category. See Novacor Chemicals Inc. v. United States, 171

F.3d 1376, 1380–81 (Fed. Cir. 1999).

As the CMP Boards are not capable of rendering images onto computer screens,

they do not satisfy the express terms of U.S. Note 20(ttt)(iii)(108) and therefore are not

excluded from the assessment of section 301 duties pursuant to this note. Similarly, as

the CMP Boards do not enhance the graphics performance of ADP machines, they are

not excluded from the assessment of section 301 duties under U.S. Note 20(ttt)(iii)(109).

**B.      Unfinished Logic Boards**

The exclusion found in U.S. Note 20(ttt)(iii)(110) covers "[p]rinted circuit

assemblies, constituting unfinished logic boards (described in statistical reporting

number 8473.30.1180)." For the imported merchandise to fall under this exclusion, the

court must find that it is: (1) a logic board; and (2) that it was unfinished at the time of

importation.

The parties disagree as to both issues. Defendant argues that the imported

merchandise does not qualify for this exclusion because the CMP Boards: (1) are not

logic boards, but rather each CMP Board is "a daughterboard that is plugged into a

motherboard via the PCIe slot"; and (2) are "complete, finished products at the time of

Court No. 23-00084                                                                 Page 27

importation and not 'unfinished.'" Def.'s Mot. at 25–33. Plaintiff asserts that the CMP

Boards are logic boards and were "unfinished" because the imported "merchandise was

deliberately left in an unfinished state so it could be customized by the user." Pl.'s Mot.

at 18. Instead, per Plaintiff, at the time of importation, the CMP Boards did not contain

drivers and lacked a functioning VBIOS, which meant that the imported "merchandise

was not operational in its condition as imported." Id. at 18–21. It was only after the

manufacturer provided Plaintiff with functioning VBIOS firmware that the imported

merchandise could "function as intended." Id. at 19.

> 1.    Whether the Imported Merchandise are "Logic Boards"

The term "logic board" is undefined in USTR's notice and the notes.

Reinstatement Notice, 87 Fed. Reg. 17,380 (USTR Mar. 28, 2022). Industry dictionaries

define a "logic board" as "[a]n assembly of decision-making circuits on a printed-circuit

mounting board." Logic Board, IEEE Standards Ass'n, The Authoritative Dictionary of

IEEE Standards Terms at 637 (7th ed. 2000). The CMP Boards fall within the common

and commercial meaning of "logic boards" because they are PCAs that contain "an

assembly of decision-making circuits" and are an "add-on card" that must be connected

to an ADP device or system containing a CPU in order to function. PSUMF ¶ 37; Def.'s

Resp. to PSUMF ¶ 37.

> 2.    Whether the Imported Merchandise are "Unfinished" Logic
>        Boards

Given that the CMP Boards fall within the definition of a logic board, the next

question is whether the imported merchandise were "unfinished" logic boards at the

time of importation.

Court No. 23-00084                                                  Page 28

The USTR notice and referenced provisions of the HTSUS do not provide a definition of the term "unfinished." Reinstatement Notice, 87 Fed. Reg. 17,380 (USTR Mar. 28, 2022). Further, dictionary definitions of "unfinished" are tautological. See, e.g., Unfinished, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/unfinished (defining unfinished as "not finished") (last visited Jan. 5, 2026). As such, the court looks to the "common" meaning of "unfinished." See Russell Stadelman & Co., 242 F.3d at 1048; Carl Zeiss, 195 F.3d at 1379.

In standard tariff classification analyses, the court has turned to the GRIs to determine whether merchandise classifiable under the relevant heading are "incomplete" or "unfinished." See Pomeroy Collection, Ltd. v. United States, 559 F. Supp. 2d 1374, 1386–87 (CIT 2008) (finding that "incomplete" candle lamps were classifiable as part of "complete, fully assembled candle lamps" if they have "the essential character of a complete candle lamp.") (citing GRI 2(a), "[a]ny reference in a heading to an article shall be taken to include a reference to that article incomplete … provided that, as presented, the incomplete … article has the essential character of the complete … article."). Here, for purposes of an exclusion under U.S. Note 20(ttt)(iii)(110), the court finds that "unfinished" has the common meaning of lacking the "essential character" of the complete or finished article.

The "essential character" of a complete or finished CMP Board: (1) contains all the physical components of the product; and (2) is usable for cryptocurrency mining if

used according to the manufacturer's instructions.[12] At the time of importation, Plaintiff's CMP Boards contained all of the necessary hardware and firmware components, particularly a VBIOS installed onto the EEPROM, necessary for functionality with an ADP machine. Expert Rep. of Dr. Gerhard Beckmann at 10–12, Appxs000235–000237. Further, the VBIOS installed at the time of importation was able to be used by the Plaintiff with its ADP machines, meaning that the CMP Boards were functional when connected to such machines. Dep. of Hayden Gill at 90:6–13, Appx000333; Expert Rep. of Dr. Gerhard Beckmann at 12, Appx000237. As such, Plaintiff's CMP Boards contained the essential character of the article at issue.

Plaintiff argues that the imported merchandise was "unfinished" because it was "not functional" at the time of importation. Pl.'s Mot. at 18–21. Plaintiff contends that the CMP Board's VBIOS firmware was not to its preferred specifications, and as such, was not functional. Id. at 18. The manufacturer, however, explained that Plaintiff sought updated VBIOS firmware to improve mining performance, not to enable functionality. Specifically, NVIDIA representative, Yisheng Chen, explained that Plaintiff sought

---

[12] As a physical product, finished or completed CMP Boards contain the GPU, VRAM, EEPROM, the other electronic components such as capacitors, resistors, and other ancillary components that enable the product's functionality, as well as the protective aluminum enclosure with connection ports for power and extruding data transmission connectors. Expert Rep. of Dr. Gerhard Beckmann at 10, Appx000235; Dep. of NVIDIA Designee Yisheng Chen at 18:13–19, Appx000510. As an accessory, the CMP Boards do not function on their own, but must be connected to an ADP machine in order to function. PSUMF ¶ 37; Def.'s Resp. to PSUMF ¶ 37.

Court No. 23-00084                                                                    Page 30

updated VBIOS firmware to "overclock"[13] the CMP Boards to reach higher mining

speeds. Dep. of NVIDIA Designee Yisheng Chen at 111:2–10, Appx000603. The lack of

updated firmware that would enable the user to obtain usage of the imported

merchandise beyond the manufacturer's original specifications does not render it

"unfinished."

　　　Further, Plaintiff's argument that the imported merchandise was unfinished

because it "was also imported without the Linux drivers that are necessary to allow the

[imported merchandise] to be used with an ADP machine" is misplaced. Pl.'s Mot. at 19.

The CMP Boards themselves do not host any device drivers or application software.

Dep. of NVIDIA Designee Yisheng Chen at 62:10–24, Appx000554. Such drivers and

software must be installed on the ADP machine itself, not on the imported merchandise,

which are parts suitable for use principally with ADP machines. Dep. of Hayden Gill at

71:13–19, Appx000314; Atlas Expert Report of Dr. Sunil P. Khatri at ¶ 19, Appx000212.

　　　Plaintiff's CMP Boards are not "unfinished" logic boards, and as such, do not fall

within the description of the exclusion found in U.S. Note 20(ttt)(iii)(110). The imported

merchandise is not excluded from the assessment of section 301 duties under this

exclusion.

---

[13] "Overclocking" means to speed up a processor "beyond the manufacturer's recommendations". See Overclock, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/overclock (last visited Jan. 5, 2026).

Court No. 23-00084                                                              Page 31

### III.     The Effective Date of the Retroactive Exclusions

As the court has concluded that the imported merchandise does not fall within

the descriptions of the exclusions set forth in U.S. Notes 20(ttt)(iii)(108) through (110), it

need not consider the effective date of the retroactive exclusions.

### CONCLUSION

In conclusion, the court finds that the imported merchandise is properly classified

under HTSUS subheading 8473.30.1180. The imported merchandise is not excluded

from the assessment of section 301 duties because it does not meet the description of

the exclusions set forth in U.S. Notes 20(ttt)(iii)(108) through (110).

For the foregoing reasons, Plaintiff's motion for summary judgment is **GRANTED**

**IN PART AND DENIED IN PART**, and Defendant's cross motion for summary judgment

is **GRANTED IN PART AND DENIED IN PART**. Judgment shall be entered accordingly.


                                                    /s/      Lisa W. Wang
                                                    Lisa W. Wang, Judge

Dated:     January 27, 2026
           New York, New York

## UNITED STATES COURT OF INTERNATIONAL TRADE

ATLAS POWER LLC,

      Plaintiff,

v.

UNITED STATES,

      Defendant.

Before: Lisa W. Wang, Judge

Court No. 23-00084

### JUDGMENT

This case having been duly submitted for decision; and the court, after due deliberation, having rendered a decision herein; now therefore, in conformity with said decision, it is hereby

**ORDERED** that Plaintiff's merchandise is correctly classified under HTSUS subheading 8473.30.1180; and

**ORDERED** that Plaintiff's merchandise is not excluded from the assessment of section 301 duties because it does not meet the description of the exclusions set forth in U.S. Notes 20(ttt)(iii)(108) through (110).

/s/     Lisa W. Wang
              Judge

Dated: February 24, 2026
      New York, New York

Appx000036

**Harmonized Tariff Schedule of the United States Basic Revision 8 (2021)**
Annotated for Statistical Reporting Purposes

## GENERAL RULES OF INTERPRETATION

Classification of goods in the tariff schedule shall be governed by the following principles:

1.  The table of contents, alphabetical index, and titles of sections, chapters and sub-chapters are provided for ease of reference only; for legal purposes, classification shall be determined according to the terms of the headings and any relative section or chapter notes and, provided such headings or notes do not otherwise require, according to the following provisions:

2.  (a)  Any reference in a heading to an article shall be taken to include a reference to that article incomplete or unfinished, provided that, as entered, the incomplete or unfinished article has the essential character of the complete or finished article. It shall also include a reference to that article complete or finished (or falling to be classified as complete or finished by virtue of this rule), entered unassembled or disassembled.

    (b)  Any reference in a heading to a material or substance shall be taken to include a reference to mixtures or combinations of that material or substance with other materials or substances. Any reference to goods of a given material or substance shall be taken to include a reference to goods consisting wholly or partly of such material or substance. The classification of goods consisting of more than one material or substance shall be according to the principles of rule 3.

3.  When, by application of rule 2(b) or for any other reason, goods are, prima facie, classifiable under two or more headings, classification shall be effected as follows:

    (a)  The heading which provides the most specific description shall be preferred to headings providing a more general description. However, when two or more headings each refer to part only of the materials or substances contained in mixed or composite goods or to part only of the items in a set put up for retail sale, those headings are to be regarded as equally specific in relation to those goods, even if one of them gives a more complete or precise description of the goods.

    (b)  Mixtures, composite goods consisting of different materials or made up of different components, and goods put up in sets for retail sale, which cannot be classified by reference to 3(a), shall be classified as if they consisted of the material or component which gives them their essential character, insofar as this criterion is applicable.

    (c)  When goods cannot be classified by reference to 3(a) or 3(b), they shall be classified under the heading which occurs last in numerical order among those which equally merit consideration.

4.  Goods which cannot be classified in accordance with the above rules shall be classified under the heading appropriate to the goods to which they are most akin.

5.  In addition to the foregoing provisions, the following rules shall apply in respect of the goods referred to therein:

    (a)  Camera cases, musical instrument cases, gun cases, drawing instrument cases, necklace cases and similar containers,specially shaped or fitted to contain a specific article or set of articles, suitable for long-term use and entered with the articles for which they are intended, shall be classified with such articles when of a kind normally sold therewith. This rule does not,however, apply to containers which give the whole its essential character;

    (b)  Subject to the provisions of rule 5(a) above, packing materials and packing containers entered with the goods therein shall be classified with the goods if they are of a kind normally used for packing such goods. However, this provision is not binding when such packing materials or packing containers are clearly suitable for repetitive use.

6.  For legal purposes, the classification of goods in the subheadings of a heading shall be determined according to the terms of those subheadings and any related subheading notes and, mutatis mutandis, to the above rules, on the understanding that only subheadings at the same level are comparable. For the purposes of this rule, the relative section, chapter and subchapter notes also apply, unless the context otherwise requires.

not be able to be accommodated. The public may have an opportunity to provide comments at this meeting at the invitation of the chair. Members of the public may also submit a brief comment (less than three pages) to the committee in writing to *IDET@state.gov* for inclusion in the public minutes of the meeting.

### Agenda

*Wednesday, April 27 at 1:00 p.m. (ET)*

- Roll call
- Project Planning
- Next Steps and Other Business
- Public Comment
- Adjournment

**Kevin E. Bryant,**
*Deputy Director, Office of Directives Management, Department of State.*
[FR Doc. 2022–06418 Filed 3–25–22; 8:45 am]
**BILLING CODE 4710–AE–P**

---

## DEPARTMENT OF STATE

[Public Notice 11691]

### Notice of Determinations; Culturally Significant Objects Being Imported for Exhibition—Determinations: "Chroma: Ancient Sculpture in Color" Exhibition

**SUMMARY:** Notice is hereby given of the following determinations: I hereby determine that certain objects being imported from abroad pursuant to an agreement with their foreign owner or custodian for temporary display in the exhibition "Chroma: Ancient Sculpture in Color" at The Metropolitan Museum of Art, New York, New York, and at possible additional exhibitions or venues yet to be determined, are of cultural significance, and, further, that their temporary exhibition or display within the United States as aforementioned is in the national interest. I have ordered that Public Notice of these determinations be published in the **Federal Register**.

**FOR FURTHER INFORMATION CONTACT:** Chi D. Tran, Program Administrator, Office of the Legal Adviser, U.S. Department of State (telephone: 202–632–6471; email: *section2459@state.gov*). The mailing address is U.S. Department of State, L/PD, 2200 C Street NW (SA–5), Suite 5H03, Washington, DC 20522–0505.

**SUPPLEMENTARY INFORMATION:** The foregoing determinations were made pursuant to the authority vested in me by the Act of October 19, 1965 (79 Stat. 985; 22 U.S.C. 2459), E.O. 12047 of March 27, 1978, the Foreign Affairs Reform and Restructuring Act of 1998 (112 Stat. 2681, *et seq.;* 22 U.S.C. 6501 note, *et seq.*), Delegation of Authority

No. 234 of October 1, 1999, Delegation of Authority No. 236–3 of August 28, 2000, and Delegation of Authority No. 523 of December 22, 2021.

**Stacy E. White,**
*Deputy Assistant Secretary for Professional and Cultural Exchanges, Bureau of Educational and Cultural Affairs, Department of State.*
[FR Doc. 2022–06460 Filed 3–25–22; 8:45 am]
**BILLING CODE 4710–05–P**

---

## DEPARTMENT OF STATE

[Public Notice 11692 ]

### Notice of Determinations; Culturally Significant Objects Being Imported for Exhibition—Determinations: "Cézanne" Exhibition

**SUMMARY:** Notice is hereby given of the following determinations: I hereby determine that certain objects being imported from abroad pursuant to agreements with their foreign owners or custodians for temporary display in the exhibition "Cézanne" at the Art Institute of Chicago, in Chicago, Illinois, and at possible additional exhibitions or venues yet to be determined, are of cultural significance, and, further, that their temporary exhibition or display within the United States as aforementioned is in the national interest. I have ordered that Public Notice of these determinations be published in the **Federal Register**.

**FOR FURTHER INFORMATION CONTACT:** Chi D. Tran, Program Administrator, Office of the Legal Adviser, U.S. Department of State (telephone: 202–632–6471; email: *section2459@state.gov*). The mailing address is U.S. Department of State, L/PD, 2200 C Street NW (SA–5), Suite 5H03, Washington, DC 20522–0505.

**SUPPLEMENTARY INFORMATION:** The foregoing determinations were made pursuant to the authority vested in me by the Act of October 19, 1965 (79 Stat. 985; 22 U.S.C. 2459), E.O. 12047 of March 27, 1978, the Foreign Affairs Reform and Restructuring Act of 1998 (112 Stat. 2681, *et seq.;* 22 U.S.C. 6501 note, *et seq.*), Delegation of Authority No. 234 of October 1, 1999, Delegation of Authority No. 236–3 of August 28, 2000, and Delegation of Authority No. 523 of December 22, 2021.

**Stacy E. White,**
*Deputy Assistant Secretary for Professional and Cultural Exchanges, Bureau of Educational and Cultural Affairs, Department of State.*
[FR Doc. 2022–06474 Filed 3–25–22; 8:45 am]
**BILLING CODE 4710–05–P**

---

## OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE

### Notice of Reinstatement of Certain Exclusions: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation

**AGENCY:** Office of the United States Trade Representative (USTR).
**ACTION:** Notice.

**SUMMARY:** In prior **Federal Register** notices, the U.S. Trade Representative modified the action in the Section 301 investigation of China's acts, policies, and practices related to technology transfer, intellectual property, and innovation by excluding certain products from additional duties. The U.S. Trade Representative subsequently extended 549 of these exclusions. Following public notice and comment, the U.S. Trade Representative has determined to reinstate certain previously extended exclusions through December 31, 2022, as specified in the Annex to this notice.

**DATES:** The reinstated product exclusions announced in this notice will apply as of October 12, 2021, and extend through December 31, 2022. U.S. Customs and Border Protection will issue instructions on entry guidance and implementation.

**FOR FURTHER INFORMATION CONTACT:** For general questions about this notice, contact Associate General Counsel Philip Butler or Assistant General Counsel Rachel Hasandras at (202) 395–5725. For specific questions on customs classification or implementation of the product exclusion identified in the Annex to this notice, contact *traderemedy@cbp.dhs.gov.*

**SUPPLEMENTARY INFORMATION:**

### A. Background

In the course of this investigation the U.S. Trade Representative imposed additional duties on products of China in four tranches. *See* 83 FR 28719 (June 20, 2018); 83 FR 40823 (August 16, 2018); 83 FR 47974 (September 21, 2018), as modified by 83 FR 49153 (September 28, 2018); and 84 FR 43304 (August 20, 2019), as modified by 84 FR 69447 (December 18, 2019) and 85 FR 3741 (January 22, 2020). Each tranche is commonly known as a 'List', *e.g.,* List 1, List 2, etc. The fourth tranche is contained in Lists 4A and 4B. No tariffs on List 4B currently are in effect.

For each tranche, the U.S. Trade Representative established a process by which U.S. stakeholders could request the exclusion of particular products subject to the action. The first tranche

of exclusions expired in December 2019 and the final tranche of exclusions expired in October 2020. Starting in November 2019, the U.S. Trade Representative established processes for submitting public comments on whether to extend particular exclusions. *See, e.g.,* 85 FR 6687 (February 5, 2019) and 85 FR 38482 (June 26, 2020). Pursuant to these processes, the U.S. Trade Representative determined to extend 137 exclusions covered under List 1, 59 exclusions on List 2, 266 exclusions on List 3, and 87 exclusions on List 4. With the exception of exclusions related to the COVID–19 pandemic, all of these 549 exclusions have expired. In particular, the exclusions for most of these products expired by December 31, 2020, and the remaining exclusions expired in 2021. *See* 85 FR 15849 and 85 FR 20332. USTR has separately addressed the extension of COVID–19 exclusions. *See* 86 FR 48280 (August 27, 2021), 86 FR 54011 (September 29, 2021), and 86 FR 63438 (November 16 2021).

On October 8, 2021, the U.S. Trade Representative invited the public to comment on whether to reinstate particular exclusions previously granted and extended under the four tranches (the October 8 notice). The October 8 notice set out the following factors to be considered in decisions on possible reinstatement, and invited public comment:

• Whether the particular product and/or a comparable product is available from sources in the United States and/or in third countries.

• Any changes in the global supply chain since September 2018 with respect to the particular product or any other relevant industry developments.

• The efforts, if any, the importers or U.S. purchasers have undertaken since September 2018 to source the product from the United States or third countries.

• Domestic capacity for producing the product in the United States.

In addition, USTR considered whether or not reinstating the exclusion would impact or result in severe economic harm to the commenter or other U.S. interests, including the impact on small businesses, employment, manufacturing output, and critical supply chains in the United States, as well as the overall impact of the exclusions on the goal of obtaining the elimination of China's acts, policies, and practices covered in the Section 301 investigation.

## B. Determination To Reinstate Certain Exclusions

Based on evaluation of the factors set out in in the October 8 notice, and pursuant to sections 301(b), 301(c), and 307(a) of the Trade Act of 1974, as amended, the U.S. Trade Representative has determined to reinstate certain exclusions described in the October 8 notice through December 31, 2022, as set out in the Annex to this notice. The U.S. Trade Representative's determination considers public comments submitted in response to the October 8 notice, and the advice of advisory committees, the interagency Section 301 Committee, and the White House COVID–19 Response Team.

The reinstated exclusions are available for any product that meets the description in the product exclusion. In particular, the scope of each exclusion is governed by the scope of the ten-digit Harmonized Tariff Schedule of the United States (HTSUS) subheadings and product descriptions in the Annex to this notice.

As stated in the October 8 notice, the reinstated exclusions are retroactive to October 12, 2021. In particular, the reinstated exclusions will apply to goods entered for consumption, or withdrawn from warehouse for consumption, on or after 12:01 a.m. eastern daylight time on October 12, 2021, that are not liquidated or to entries that are liquidated, but within the period for protest described in section 514 of the Tariff Act of 1930, as amended. The U.S. Trade Representative has determined to extend the reinstated exclusions through December 31, 2022, and may consider further extensions as appropriate.

U.S. Customs and Border Protection will issue instructions on entry guidance and implementation.

**Greta M. Peisch,**
*General Counsel, Office of the United States Trade Representative.*
**BILLING CODE 3290–F2–P**

**ANNEX for Reinstatement of Certain Exclusions Previously Extended**

A.  Effective with respect to good entered for consumption, or withdrawn from warehouse for consumption, on or after 12:01 a.m. eastern daylight time on October 12, 2021, and before 11:59 p.m. eastern daylight time on December 31, 2022, subchapter III of chapter 99 of the Harmonized Tariff Schedule of the United States (HTSUS) is modified:

1.  by inserting the following new heading 9903.88.67 in numerical sequence, with the material in the new heading inserted in the columns of the HTSUS labeled "Heading/Subheading", "Article Description", and "Rates of Duty 1-General", respectively:

| Heading/ Subheading | Article Description | Rates of Duty | | |
|---|---|---|---|---|
| | | 1 | | 2 |
| | | General | Special | |
| "9903.88.67 | Effective with respect to entries on or after October 12, 2021 and through December 31, 2022, articles the product of China, as provided for in U.S. note 20(ttt) to this subchapter, each covered by an exclusion granted by the U.S. Trade Representative . . . . . . . . . . . . . . . . . . . . . | The duty provided in the applicable subheading" | | |

2.  by inserting the following new U.S. note 20(ttt) to subchapter III of chapter 99 in numerical sequence:

"(ttt)(i) The U.S. Trade Representative determined to establish a process by which particular products classified in heading 9903.88.01 and provided for in U.S. notes 20(a) and 20(b) to this subchapter could be excluded from the additional duties imposed by heading 9903.88.01. See 83 Fed. Reg. 40823 (August 16, 2018) and 83 Fed. Reg. 47326 (September 18, 2018). Pursuant to the product exclusion process, the U.S. Trade Representative has determined that, as provided in heading 9903.88.67, the additional duties provided for in heading 9903.88.01 shall not apply to the following particular products, which are provided for in the enumerated statistical reporting numbers:

1)  8412.21.0045
2)  8481.10.0090
3)  8483.50.9040
4)  8525.60.1010
5)  8607.21.1000
6)  9030.90.4600
7)  Direct acting and spring return pneumatic actuators, each rated at a maximum pressure of 10 bar and valued over $68 but not over $72 per unit (described in statistical reporting number 8412.39.0080)
8)  Centrifugal pumps, submersible, other than for use with machines for making cellulosic pulp, paper or paperboard; the foregoing pumps rated not over 1.5 KW (described in statistical reporting number 8413.70.2004)

26) Liquid leak detectors (described in statistical reporting number 8543.70.9960 prior to January 27, 2022; described in statistical reporting number 8543.70.9860 effective January 27, 2022)

27) Robots, programmable, measuring not more than 40 cm high by 22 cm wide by 27 cm deep, incorporating an LCD display, camera and microphone but without "hands" (described in statistical reporting number 8543.70.9960 prior to January 27, 2022; described in statistical reporting number 8543.70.9860 effective January 27, 2022)

28) Monopolar conductors for a voltage exceeding 1,000 V, other than of copper and not fitted with connectors (described in statistical reporting number 8544.60.6000)

29) Follower block plates, designed for use with buffering/cushioning systems of freight railcars of heading 8606 (described in statistical reporting number 8607.30.1000)

30) Motorcycles (including mopeds), with reciprocating internal combustion piston engine of a cylinder capacity not exceeding 50 cc, valued not over $500 each (described in statistical reporting number 8711.10.0000)

31) Motorcycles with electric power for propulsion, each of a power not exceeding 1,000 W (described in statistical reporting numbers 8711.60.0050 or 8711.60.0090, effective July 1, 2019; described in statistical reporting number 8711.60.0000, effective prior to July 1, 2019)

32) Digital clinical thermometers (described in statistical reporting number 9025.19.8040 prior to July 1, 2020; described in statistical reporting number 9025.19.8010 or 9025.19.8020 effective July 1, 2020)

33) Digital clinical thermometers, valued not over $11 each (described in statistical reporting number 9025.19.8040 prior to July 1, 2020; described in statistical reporting number 9025.19.8010 or 9025.19.8020 effective July 1, 2020)

34) Portable, wireless enabled, electrical gas monitors (described in statistical reporting number 9027.10.2000)

(iii) The U.S. Trade Representative determined to establish a process by which particular products classified in heading 9903.88.03 and provided for in U.S. notes 20(e) and 20(f) to this subchapter could be excluded from the additional duties imposed by heading 9903.88.03, and by which particular products classified in heading 9903.88.04 and provided for in U.S. note 20(g) to this subchapter could be excluded from the additional duties imposed by heading 9903.88.04. See 83 Fed. Reg. 47974 (September 21, 2018) and 84 Fed. Reg. 29576 (June 24, 2019). Pursuant to the product exclusion process, the U.S. Trade Representative has determined that, as provided in heading 9903.88.67, the additional duties provided for in heading 9903.88.03 or in heading 9903.88.04 shall not apply to the following particular products, which are provided for in the enumerated statistical reporting numbers:

1) 0304.72.5000
2) 0304.83.1015
3) 0304.83.1020
4) 0304.83.5015
5) 0304.83.5020
6) 0304.83.5090
7) 3923.21.0095
8) 3926.20.9050
9) 5603.12.0090
10) 5603.14.9090
11) 5603.92.0090
12) 5603.93.0090
13) 6505.00.8015

100) DC blowers for use in motor vehicle climate control systems, each measuring no less than 323 mm by 122 mm by 102 mm and no more than 357 mm by 214 mm by 167 mm (described in statistical reporting number 8414.59.6540)

101) DC centrifugal radial blowers, each measuring not less than 345 mm by 122 mm by 102 mm and not more than 355 mm by 173 mm by 145 mm, of an output of 100 W to 285 W, and weighing at least 1.80 kg but no more than 2.72 kg (described in statistical reporting number 8414.59.6560)

102) Electric display cases incorporating refrigerating equipment designed for commercial use, each with a glass front to display the food or drink being stored (described in statistical reporting number 8418.50.0080)

103) Upright coolers incorporating refrigerating equipment, each measuring not more than 77 cm in width, not more than 78 cm in depth and not more than 200 cm in height, weighing not more than 127 kg, with one swing-type transparent glass door (described in statistical reporting number 8418.50.0080)

104) Compact portable shipping scales, of stainless steel, with a maximum weighing capacity of not more than 16 kg, with a digital display, weight below hook, and handles, measuring not less than 19 cm in width, not less than 21 cm in depth, not less than 3 cm in height but not more than 52 cm in width, not more than 41 cm in depth, not more than 13 cm in height (described in statistical reporting number 8423.81.0040)

105) Screw jacks and scissor jacks, each comprising a base, two lift arms and adjustable wheel pads, weighing at least 22 kg but not more than 42 kg, with a weight limit of not more than 342 kg (described in statistical reporting number 8425.49.0000)

106) Sewing machines, not of the household type, not specially designed to join footwear soles to uppers; each such machine weighing 45 kg or more but not over 140 kg, suitable for sewing leather (described in statistical reporting number 8452.29.9000)

107) Trackpad input units for automatic data processing (ADP) machines, each valued over $100 (described in statistical reporting number 8471.60.9050)

108) Printed circuit assemblies for rendering images onto computer screens ("graphics processing modules") (described in statistical reporting number 8473.30.1180)

109) Printed circuit assemblies to enhance the graphics performance of automatic data processing (ADP) machines ("accelerator modules") (described in statistical reporting number 8473.30.1180)

110) Printed circuit assemblies, constituting unfinished logic boards (described in statistical reporting number 8473.30.1180)

111) Parts and accessories of machines of heading 8471, whether or not incorporating fan hubs or LEDs but not incorporating other goods of heading 8541 or 8542 (described in statistical reporting number 8473.30.5100)

112) Ratchet tie down straps, each consisting of straps of textiles measuring not less than 25 mm and not more than 105 mm in width and not more than 12.5 m in length, steel hooks at opposite ends of the straps and a gear and pawl mechanism for adjusting the length of the whole (described in statistical reporting number 8479.89.9499 prior to January 27, 2022; described in statistical reporting number 8479.89.9599 effective January 27, 2022)

113) Hand-operated valves of plastics, each comprising a bottle lid, drinking spout and flavor dispensing valve (described in statistical reporting number 8481.80.5090)

114) Single phase AC electric motors (other than gear motors), of an output of 56 W or more but not exceeding 69 W, each measuring no more than 9 cm in length and no more than 11.5 cm in diameter, weighing no more than 2 kg, in a housing of base metals, with a switch (described in statistical reporting number 8501.40.2040)

115) Electric gear motors, single phase AC, of an output of 74.6 W or more but not exceeding 228 W, each with a spring, a coupling, and a locking connector, the

**Harmonized Tariff Schedule of the United States Basic Revision 8 (2021)**
Annotated for Statistical Reporting Purposes

CHAPTER 99

TEMPORARY LEGISLATION; TEMPORARY MODIFICATIONS ESTABLISHED
PURSUANT TO TRADE LEGISLATION; ADDITIONAL IMPORT RESTRICTIONS
ESTABLISHED PURSUANT TO SECTION 22 OF THE AGRICULTURAL
ADJUSTMENT ACT, AS AMENDED

XXII
99-1

U.S. Notes

1.      The provisions of this chapter relate to legislation and to executive and administrative actions pursuant to duly constituted authority, under which:

   a.      One or more of the provisions in chapters 1 through 98 are temporarily amended or modified; or.

   b.      Additional duties or other import restrictions are imposed by, or pursuant to, collateral legislation.

2.      Unless the context requires otherwise, the general notes and rules of interpretation, the section notes, and the notes in chapters 1 through 98 apply to the provisions of this chapter.

Statistical Notes

1.      For statistical reporting of merchandise provided for herein:

   a.      Unless more specific instructions appear in the subchapters of this chapter, report the 8-digit heading or subheading number (or 10-digit statistical reporting number, if any) found in this chapter in addition to the 10-digit statistical reporting number appearing in chapters 1 through 97 which would be applicable but for the provisions of this chapter; and

   b.      The quantities reported should be in the units provided in chapters 1 through 97.

2.      For those headings and subheadings herein for which no rate of duty appears (i.e., those headings and subheadings for which an absolute quota is prescribed), report the 8-digit heading or subheading number herein followed by the appropriate 10-digit statistical reporting number from chapters 1 through 97. The quantities reported should be in the units provided in chapters 1 through 97.

> # **NOTICE TO EXPORTERS**
>
> The statistical reporting numbers contained in this chapter apply only to imports and may not be reported on Shipper's Export Declarations. See Notice to Exporters preceding chapter 1.

Case: 26-1479     Document: 7     Page: 83     Filed: 05/04/2026
**Harmonized Tariff Schedule of the United States Basic Revision 8 (2021)**
Annotated for Statistical Reporting Purposes

XXII
99 - III - 15

<u>U.S. Notes</u> (con.)

(c)     The Secretary of Commerce may determine and announce any exclusions from headings 9903.85.01,9903.85.03, and 9903.85.21 that may be appropriate for individual derivative aluminum products or individual aluminum products otherwise covered by subdivision (a)(iii) or subdivision (b) of this note, respectively, or for individual shipments thereof, whether or not limited to particular quantities of any such goods or shipments, and shall immediately convey all such determinations to U.S. Customs and Border Protection ("CBP") for implementation by CBP at the earliest possible opportunity, but not later than five business days after the date on which CBP receives any such determination from Commerce. Pursuant to subheading 9903.85.11 and superior text thereto, the Secretary may provide that any excluded product shall be granted entry into the customs territory of the United States when the applicable quantitative limitation has filled for the specified period for such good.

(d)     Any importer entering the aluminum products covered by this note under heading 9903.85.01 or heading 9903.85.21 and subheadings 9903.85.06 and 9903.85.06 and 9903.85.11, inclusive, or any importer of derivative aluminum products covered by this note under heading 9903.85.03, shall provide any information that may be required, and in such form, as is deemed necessary by CBP in order to permit the administration of this subheading. Importers are likewise directed to report information concerning any applicable exclusion granted by Commerce in such form as CBP may require.

(e)     Subheadings 9903.85.05 and 9903.85.06, inclusive, set forth the ordinary customs duty treatment for the aluminum products (as enumerated in subdivision (b) of this note) of any country enumerated in the superior text to such subheadings, subject to the annual aggregate quantitative limitations proclaimed for these subheadings and as set forth on the Internet site of CBP at the following link: https://www.cbp.gov/trade/quota. Beginning on July 1, 2018, imports from any such country in an aggregate quantity under any such subheading during any of the periods January through March, April through June, July through September, or October through December in any year that is in excess of 500,000 kg and in excess of 30 percent of the total aggregate quantity provided for a calendar year for such country, as set forth on the Internet site of CBP, shall not be allowed.

20. (a)     For the purposes of heading 9903.88.01, products of China, as provided for in this note, shall be subject to an additional 25 percent *ad valorem* rate of duty. The products of China that are subject to an additional 25 percent *ad valorem* rate of duty under heading 9903.88.01 are products of China that are classified in the subheadings enumerated in U.S. note 20(b) to subchapter III. All products of China that are classified in the subheadings enumerated in U.S. note 20(b) to subchapter III are subject to the additional 25 percent *ad valorem* rate of duty imposed by heading 9903.88.01, except products of China granted an exclusion by the U.S. Trade Representative and provided for in: (1) heading 9903.88.05 and U.S. note 20(h) to subchapter III of chapter 99; (2) heading 9903.88.06 and U.S. note 20(i) to subchapter III of chapter 99; (3) heading 9903.88.07 and U.S. note 20(j) to subchapter III of chapter 99; (4) heading 9903.88.08 and U.S. note 20(k) to subchapter III of chapter 99; (5) heading 9903.88.10 and U.S. note 20(m) to subchapter III of chapter 99; (6) heading 9903.88.11 and U.S. note 20(n) to subchapter III of chapter 99; (7) heading 9903.88.14 and U.S. note 20(q) to subchapter III of chapter 99; (8) heading 9903.88.19 and U.S. note 20(x) to subchapter III of chapter 99; (9) heading 9903.88.50 and U.S. note 20(ccc) to subchapter III of chapter 99; (10) heading 9903.88.52 and U.S. note 20(eee) to subchapter III of chapter 99; (11) heading 9903.88.58 and U.S. note 20(kkk) to subchapter III of chapter 99; (12) heading 9903.88.60 and U.S. note 20(mmm) to subchapter III of chapter 99; or (13) heading 9903.88.62 and U.S. note 20(ooo) to subchapter III of chapter 99. [**Compiler's note: Although exclusions for certain COVID-related goods were extended by USTR, most exclusions from additional duties under this note expired at the close of Dec. 31, 2020; consult Customs and/or the <u>Federal Register</u> for more information. Online revisions to this edition may contain more current information.**]

Notwithstanding U.S. note 1 to this subchapter, all products of China that are subject to the additional 25 percent *ad valorem* rate of duty imposed by heading 9903.88.01 shall also be subject to the general rates of duty imposed on products of China classified in the subheadings enumerated in U.S. note 20(b) to subchapter III.

Products of China that are classified in the subheadings enumerated in U.S. note 20(b) to subchapter III and that are eligible for special tariff treatment under general note 3(c)(i) to the HTSUS, or that are eligible for temporary duty exemptions or reductions under subchapter II to chapter 99, shall be subject to the additional 25 percent *ad valorem* rate of duty imposed by heading 9903.88.01.

The additional duties imposed by heading 9903.88.01 do not apply to goods for which entry is properly claimed under a provision of chapter 98 of the HTSUS, except for goods entered under subheadings 9802.00.40, 9802.00.50, and 9802.00.60, and heading 9802.00.80. For subheadings 9802.00.40, 9802.00.50, and 9802.00.60, the additional duties apply to the value of repairs, alterations, or processing performed abroad, as described in the applicable subheading. For heading 9802.00.80, the additional duties apply to the value of the article less the cost or value of such products of the United States, as described in heading 9802.00.80.

Products of China that are provided for in heading 9903.88.01 and classified in one of the subheadings enumerated in U.S. note 20(b) to subchapter III shall continue to be subject to antidumping, countervailing, or other duties, fees, exactions and charges that apply to such products, as well as to the additional 25 percent *ad valorem* rate of duty imposed by heading 9903.88.01.

XXII
99 - III - 16

<u>U.S. Notes</u> (con.)

(b)      Heading 9903.88.01 applies to all products of China that are classified in the following 8-digit subheadings, except products of China granted an exclusion by the U.S. Trade Representative and provided for in: (1) heading 9903.88.05 and U.S. note 20(h) to subchapter III of chapter 99; (2) heading 9903.88.06 and U.S. note 20(i) to subchapter III of chapter 99; (3) heading 9903.88.07 and U.S. note 20(j) to subchapter III of chapter 99; (4) heading 9903.88.08 and U.S. note 20(k) to subchapter III of chapter 99; (5) heading 9903.88.10 and U.S. note 20(m) to subchapter III of chapter 99; (6) heading 9903.88.11 and U.S. note 20(n) to subchapter III of chapter 99; (7) heading 9903.88.14 and U.S. note 20(q) to subchapter III of chapter 99; (8) heading 9903.88.19 and U.S. note 20(x) to subchapter III of chapter 99; (9) heading 9903.88.50 and U.S. note 20(ccc) to subchapter III of chapter 99; (10) heading 9903.88.52 and U.S. note 20(eee) to subchapter III of chapter 99; (11) heading 9903.88.58 and U.S. note 20(kkk) to subchapter III of chapter 99; (12) heading 9903.88.60 and U.S. note 20(mmm) to subchapter III of chapter 99; or (13) heading 9903.88.62 and U.S. note 20(ooo) to subchapter III of chapter 99: [Compiler's note: list of subheadings may begin on following page; read numbers from left to right]

Case: 26-1479   Document: 7   Page: 85   Filed: 05/04/2026
**Harmonized Tariff Schedule of the United States Basic Revision 8 (2021)**
Annotated for Statistical Reporting Purposes

XXII
99 - III - 23

<u>U.S. Notes</u> (con.)

| | | | |
|---|---|---|---|
| 9001.20.00 | 9014.10.90 | 9025.19.40 | 9025.19.80 |
| 9025.80.10 | 9027.10.20 | 9028.10.00 | 9028.20.00 |
| 9028.30.00 | 9029.20.40 | 9029.90.80 | 9030.31.00 |
| 9030.32.00 | 9030.84.00 | 9030.89.01 | |

(e)    For the purposes of heading 9903.88.03, products of China, as provided for in this note, shall be subject to an additional 25 percent ad valorem rate of duty. The products of China that are subject to an additional 25 percent ad valorem rate of duty under heading 9903.88.03 are products of China that are classified in the subheadings enumerated in U.S. note 20(f) to subchapter III. All products of China that are classified in the subheadings enumerated in U.S. note 20(f) to subchapter III are subject to the additional 25 percent ad valorem rate of duty imposed by heading 9903.88.03, except products of China granted an exclusion by the U.S. Trade Representative and provided for in (1) heading 9903.88.13 and U.S. note 20(p) to subchapter III of chapter 99; (2) heading 9903.18.18 and U.S. note 20(w) to subchapter III of chapter 99; (3) heading 9903.88.33 and U.S. note 20(ll) to subchapter III of chapter 99; (4) heading 9903.88.34 and U.S. note 20(mm) to subchapter III of chapter 99; (5) heading 9903.88.35 and U.S. note 20(nn) to subchapter III of chapter 99; (6) heading 9903.88.36 and U.S. note 20(oo) to subchapter III of chapter 99; (7) heading 9903.88.37 and U.S. note 20(pp) to subchapter III of chapter 99; (8) heading 9903.88.38 and U.S. note 20(qq) to subchapter III of chapter 99; (9) heading 9903.88.40 and U.S. note 20(ss) to subchapter III of chapter 99; (10) heading 9903.88.41 and U.S. note 20(tt) to subchapter III of chapter 99; (11) heading 9903.88.43 and U.S. note 20(vv) to subchapter III of chapter 99; (12) heading 9903.88.45 and U.S. note 20(xx) to subchapter III of chapter 99; (13) heading 9903.88.46 and U.S. note 20(yy) to subchapter III of chapter 99; (14) heading 9903.88.48 and U.S. note 20(aaa) to subchapter III of chapter 99; (15) heading 9903.88.56 and U.S. note 20(iii) to subchapter III of chapter 99; or (16) heading 9903.88.64 and U.S. note 20(qqq) to subchapter III of chapter 99.

Notwithstanding U.S. note 1 to this subchapter, all products of China that are subject to the additional 25 percent ad valorem rate of duty imposed by heading 9903.88.03 shall also be subject to the general rates of duty imposed on products of China classified in the subheadings enumerated in U.S. note 20(f) to subchapter III.

Products of China that are classified in the subheadings enumerated in U.S. note 20(f) to subchapter III and that are eligible for special tariff treatment under general note 3(c)(i) to the tariff schedule, or that are eligible for temporary duty exemptions or reductions under subchapter II to chapter 99, shall be subject to the additional 25 percent ad valorem rate of duty imposed by heading 9903.88.03.

The additional duties imposed by heading 9903.88.03 do not apply to goods for which entry is properly claimed under a provision of chapter 98 of the HTSUS, except for goods entered under subheadings 9802.00.40, 9802.00.50, and 9802.00.60, and heading 9802.00.80. For subheadings 9802.00.40, 9802.00.50, and 9802.00.60, the additional duties apply to the value of repairs, alterations, or processing performed abroad, as described in the applicable subheading. For heading 9802.00.80, the additional duties apply to the value of the article less the cost or value of such products of the United States, as described in heading 9802.00.80.

Products of China that are provided for in heading 9903.88.03 and classified in one of the subheadings enumerated in U.S. note 20(f) to subchapter III shall continue to be subject to antidumping, countervailing, or other duties, fees, exactions and charges that apply to such products, as well as to the additional 25 percent ad valorem rate of duty imposed by heading 9903.88.03.

XXII
99 - III - 24

<u>U.S. Notes</u> (con.)

(f)     Heading 9903.88.03 applies to all products of China that are classified in the following 8-digit subheadings, except products of China granted an exclusion by the U.S. Trade Representative and provided for in (1) heading 9903.88.13 and U.S. note 20(p) to subchapter III of chapter 99; (2) heading 9903.88.18 and U.S. note 20(w) to subchapter III of chapter 99; (3) heading 9903.88.33 and U.S. note 20(ll) to subchapter III of chapter 99; (4) U.S. note 20(mm) to subchapter III of chapter 99; (5) heading 9903.88.35 and U.S. note 20(nn) to subchapter III of chapter 99; (6) heading 9903.88.36 and U.S. note 20(oo) to subchapter III of chapter 99; (7) heading 9903.88.37 and U.S. note 20(pp) to subchapter III of chapter 99; (8) heading 9903.88.38 and U.S. note 20(qq) to subchapter III of chapter 99; (9) heading 9903.88.40 and U.S. note 20(ss) to subchapter III of chapter 99; (10) heading 9903:88.41 and U.S. note 20(tt) to subchapter III of chapter 99; (11) heading 9903.88.43 and U.S. note 20(vv) to subchapter III of chapter 99; (12) heading 9903.88.45 and U.S. note 20(xx) to subchapter III of chapter 99; (13) heading 9903.88.46 and U.S. note 20(yy) to subchapter III of chapter 99; (14) heading 9903.88.48 and U.S. note 20(aaa) to subchapter III of chapter 99; (15) heading 9903.88.56 and U.S. note 20(iii) to subchapter III of chapter 99; or (16) heading 9903.88.64 and U.S. note 20(qqq) to subchapter III of chapter 99. [Compiler's note: list of subheadings may begin on following page; read numbers from left to right]

U.S. Notes (con.)

| | | | |
|---|---|---|---|
| 8302.49.60 | 8302.49.80 | 8302.50.00 | 8302.60.30 |
| 8302.60.90 | 8303.00.00 | 8306.30.00 | 8307.10.30 |
| 8307.10.60 | 8307.90.30 | 8307.90.60 | 8308.10.00 |
| 8308.20.30 | 8308.20.60 | 8308.90.30 | 8308.90.60 |
| 8308.90.90 | 8309.10.00 | 8309.90.00 | 8310.00.00 |
| 8311.10.00 | 8311.20.00 | 8311.30.30 | 8311.30.60 |
| 8311.90.00 | 8404.10.00 | 8406.81.10 | 8406.90.20 |
| 8406.90.30 | 8406.90.40 | 8406.90.45 | 8406.90.50 |
| 8406.90.60 | 8406.90.70 | 8406.90.75 | 8407.31.00 |
| 8407.32.10 | 8407.32.20 | 8407.32.90 | 8407.33.10 |
| 8407.33.30 | 8407.33.60 | 8407.33.90 | 8407.34.14 |
| 8407.34.18 | 8407.34.25 | 8407.34.44 | 8407.34.48 |
| 8407.34.55 | 8408.20.20 | 8408.20.90 | 8409.91.10 |
| 8409.91.30 | 8409.91.50 | 8409.91.92 | 8409.91.99 |
| 8409.99.10 | 8409.99.91 | 8409.99.92 | 8409.99.99 |
| 8412.90.90 | 8413.11.00 | 8413.20.00 | 8413.30.10 |
| 8413.30.90 | 8413.92.00 | 8414.10.00 | 8414.20.00 |
| 8414.40.00 | 8414.59.10 | 8414.59.15 | 8414.59.65 |
| 8414.60.00 | 8414.80.16 | 8414.80.90 | 8414.90.10 |
| 8415.10.30 | 8415.10.60 | 8415.10.90 | 8415.20.00 |
| 8415.81.01 | 8415.82.01 | 8415.83.00 | 8416.30.00 |
| 8418.10.00 | 8418.21.00 | 8418.29.10 | 8418.29.20 |
| 8418.30.00 | 8418.40.00 | 8418.50.00 | 8418.61.01 |
| 8418.91.00 | 8418.99.40 | 8418.99.80 | 8421.11.00 |
| 8421.23.00 | 8421.31.00 | 8422.90.04 | 8423.81.00 |
| 8424.20.10 | 8424.20.90 | 8424.30.10 | 8424.30.90 |
| 8424.41.10 | 8424.41.90 | 8424.49.00 | 8424.90.90 |
| 8425.19.00 | 8425.31.01 | 8425.41.00 | 8425.42.00 |
| 8425.49.00 | 8426.30.00 | 8426.91.00 | 8427.90.00 |
| 8428.40.00 | 8430.49.40 | 8430.50.10 | 8432.41.00 |
| 8433.90.10 | 8441.10.00 | 8442.50.10 | 8443.15.00 |
| 8443.16.00 | 8443.39.20 | 8443.39.30 | 8443.39.40 |
| 8443.39.50 | 8443.99.10 | 8443.99.30 | 8443.99.35 |
| 8446.30.50 | 8448.51.20 | 8451.10.00 | 8451.21.00 |
| 8451.29.00 | 8451.30.00 | 8451.40.00 | 8451.50.00 |
| 8451.80.00 | 8451.90.30 | 8451.90.60 | 8451.90.90 |
| 8452.29.90 | 8454.20.00 | 8459.29.00 | 8459.59.00 |
| 8460.39.00 | 8461.50.80 | 8465.20.10 | 8465.20.50 |
| 8465.20.80 | 8465.91.00 | 8466.91.10 | 8466.93.15 |
| 8467.19.50 | 8467.99.01 | 8468.20.10 | 8468.80.10 |
| 8468.90.10 | 8468.90.50 | 8470.10.00 | 8470.21.00 |
| 8470.29.00 | 8470.30.00 | 8470.90.01 | 8471.50.01 |
| 8471.60.10 | 8471.60.70 | 8471.60.90 | 8471.70.10 |
| 8471.70.20 | 8471.70.50 | 8471.80.10 | 8471.80.40 |
| 8471.80.90 | 8471.90.00 | 8472.10.00 | 8472.30.00 |
| 8472.90.05 | 8472.90.10 | 8472.90.60 | 8472.90.90 |
| 8473.21.00 | 8473.29.00 | 8473.30.11 | 8473.30.51 |
| 8473.30.91 | 8473.40.21 | 8473.40.41 | 8476.21.00 |
| 8476.29.00 | 8476.81.00 | 8476.90.00 | 8477.59.01 |
| 8479.60.00 | 8479.71.00 | 8479.89.10 | 8479.89.20 |
| 8479.89.70 | 8479.89.94 | 8480.10.00 | 8480.79.10 |
| 8480.79.90 | 8481.30.10 | 8481.80.10 | 8481.80.30 |
| 8481.80.50 | 8481.80.90 | 8482.10.10 | 8483.10.10 |
| 8483.10.30 | 8483.10.50 | 8483.20.40 | 8483.20.80 |
| 8483.40.50 | 8483.40.70 | 8483.50.40 | 8483.60.80 |
| 8483.90.50 | 8501.40.20 | 8501.40.40 | 8501.40.50 |
| 8501.40.60 | 8501.61.00 | 8502.20.00 | 8504.31.20 |
| 8504.31.40 | 8504.31.60 | 8504.40.60 | 8504.40.70 |
| 8504.40.85 | 8504.40.95 | 8504.50.40 | 8504.50.80 |
| 8504.90.20 | 8505.19.20 | 8505.19.30 | 8506.10.00 |
| 8506.30.10 | 8506.30.50 | 8506.80.00 | 8507.10.00 |
| 8507.20.40 | 8507.20.80 | 8507.30.40 | 8507.40.40 |
| 8507.40.80 | 8507.50.00 | 8508.11.00 | 8508.19.00 |
| 8508.60.00 | 8508.70.00 | 8509.80.20 | 8509.90.25 |
| 8509.90.35 | 8509.90.45 | 8509.90.55 | 8510.20.10 |
| 8510.20.90 | 8510.90.10 | 8510.90.20 | 8510.90.30 |

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 2026-1479

**Short Case Caption:** Atlas Power LLC v. United States

> **Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes __6,580__ words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: __05/04/2026__

Signature: /s/ J. Kevin Horgan

Name: J. Kevin Horgan

Save for Filing